UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RENEE FINNERTY,

        Plaintiff,                CIVIL ACTION NO. 04-40247

     v.                     DISTRICT JUDGE PAUL V. GADOLA

WIRELESS RETAIL, INC.,         MAGISTRATE JUDGE VIRGINIA MORGAN
RADIOSHACK CORPORATION,
KIOSK OPERATIONS, INC., and
SC KIOSKS, INC.,

        Defendants,
_____/

## REPORT AND RECOMMENDATION

### I. Introduction

       This matter comes before the court on Plaintiff's Motion for Partial Summary Judgment

(D/E #100) and Defendants Radioshack Corporation, Kiosk Operations, Inc. and SC Kiosks, Inc.

(collectively "RadioShack")'s renewed motion for summary judgment (D/E #114).  For the

reasons stated below, this court recommends that plaintiff's motion be granted, RadioShack's

motion be denied, and RadioShack be deemed a successor in interest to WRI with respect to

plaintiff's claim.

### II. Background

       For ease of reference, the deposition transcripts will be referred to as follows:

Dep I =        Deposition of Plaintiff, March 23, 2005 (pp. 21-40, 49-108, 113-124
               attached as Exhibit "Finnerty" to Plaintiff's Motion for Partial Summary
               Judgment; pp. 17-32, 41-44, 49-76, 81-108 attached as Exhibit A to
               RadioShack's Response to Plaintiff's Motion for Partial Summary
               Judgment; pp. 17-32, 49-52, 85-108 attached as Exhibit G to
               RadioShack's Renewed Motion for Summary Judgment)

Dep II =       Deposition of Harry Hill, August 30, 2005 (pp. 1, 9, 11-20, 22-23, 28-31,
               33 attached as Exhibit "Hill" to Plaintiff's Motion for Partial Summary
               Judgment

Dep III =      Deposition of Jeffrey Bland, October 8, 2007 (pp. 1-67 attached as Exhibit
               "Bland" to Plaintiff's Motion for Partial Summary Judgment; pp. 38-41,
               58-61 attached as Exhibit L to RadioShack's Response to Plaintiff's
               Motion for Partial Summary Judgment)

Dep IV =       Deposition of Andrew Zeinfeld, October 15, 2007 (pp. 1-71 attached as
               Exhibit "Zeinfeld" to Plaintiff's Motion for Partial Summary Judgment;
               pp. 1, 14-25, 50-57, 62-69 attached as Exhibit K to RadioShack's
               Response to Plaintiff's Motion for Partial Summary Judgment; pp. 1, 18-
               25, 50-57, 62-65 attached as Exhibit F to RadioShack's Renewed Motion
               for Summary Judgment)

Dep V =        Deposition of Tammy Lee, March 10, 2005 (pp. 1, 6-9 attached as Exhibit
               "Lee" to Plaintiff's Motion for Partial Summary Judgment; pp. 1, 6-9, 38-
               41 attached as Exhibit G to RadioShack's Response to Plaintiff's Motion
               for Partial Summary Judgment; pp. 1, 6-9 attached as Exhibit H to
               RadioShack's Renewed Motion for Summary Judgment; pp. 1-9 attached
               as Exhibit F to Plaintiff's Response to RadioShack's Renewed Motion for
               Summary Judgment)

Dep VI =       Deposition of Plaintiff, January 10, 2008 (pp. 178-181 attached as Exhibit
               G to RadioShack's Renewed Motion for Summary Judgment)

Wireless Retail, Inc. ("WRI") was a privately held national retail chain specializing in the

sale of cellular phones and services.  From its Arizona headquarters, WRI operated over 675

"stores," which typically consisted of "kiosks" operated inside shopping malls and other retailers including, Sam's Clubs, Wal-Marts, K-Marts, Best Buys, Home Bases and Sears. (WRI Employee Handbook, p. 2, attached as Exhibit 3 to D/E #35)

Plaintiff began working for WRI in 2000 and her job was to sell cell phones and other wireless services at kiosks in various stores, including Sam's Clubs.  (Dep I, pp. 21, 26)  Eventually plaintiff worked as a Field Manager managing five to six kiosk locations.  (Employee Change Form, January 2, 2002, attached as Exhibit A to Plaintiff's Motion for Partial Summary Judgment; Dep I, pp. 36, 40, 51)  According to plaintiff's deposition testimony, plaintiff learned she was pregnant  in March 2002 and, while she told her direct supervisor she was pregnant and needed time off, she was intimidated into working an intense workload that included working longer hours than when she was not pregnant.  (Dep I, pp. 50-51, 53, 58, 120-121)  In July 2002, plaintiff requested and received a voluntary demotion to the position of Store Supervisor in order to reduce her work hours after she became pregnant.  (Dep I, pp. 50, 60-62; Employee Change Form, attached as Exhibit B to Plaintiff's Motion for Partial Summary Judgment)

Plaintiff's deposition testimony also provides that, after the demotion, her new Field Manager insisted on maintaining a demanding schedule and, while plaintiff requested some relief due to her pregnancy, none of her superiors at WRI provided it.  (Dep I, pp. 62-63, 67-68)  In September 2002, plaintiff attempted to obtain information regarding WRI's maternity leave policy and she was told, while WRI had no maternity leave policy, plaintiff was eligible for FMLA leave.  (Dep I, pp. 82-84; September 12, 2002 e-mail, attached as Exhibit C to Plaintiff's

Motion for Partial Summary Judgment, Exhibit D to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment and Exhibit B to RadioShack's Renewed Motion for Summary Judgment)

Plaintiff was granted leave and it was to start on November 1, 2002. (Dep I, p. 91; Dep II, p. 30) Plaintiff was scheduled to work on October 25, 26 and 31, 2002. (Dep II, pp. 13-14, 22, 28-29) According to plaintiff's declaration, she had trouble standing or sitting without bladder incontinence during her October 25, 2002 shift. (Plaintiff's Declaration, August 30, 2005, attached as Exhibit F to Plaintiff's Motion for Partial Summary Judgment) According to plaintiff's deposition and the deposition of her Field Manager, plaintiff called her Field Manager prior to her shift on October 26, 2002 to request that she start her maternity leave early and he approved it. (Dep I, pp. 92-94; Dep II, pp. 13-14, 22) However, after plaintiff submitted her medical certification on November 4, 2002, she was contacted by her Field Manager and told that her employment had been terminated for three "no-call no shows." (Dep I, p. 101; Dep II, p. 17) On July 21, 2004, plaintiff filed suit against WRI in Wayne County Circuit Court, alleging violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA") and pregnancy discrimination in violation of the Elliot-Larsen Civil Rights Act, M.C.L. § 37.101 *et seq*. ("ELCRA"). (Complaint, attached as an Exhibit to D/E #1) On August 26, 2004, WRI removed the action to federal court. (Notice of Removal, D/E #1)

On October 1, 2004, WRI entered into an Asset Purchase Agreement with RadioShack.[1] Pursuant to the Asset Purchase Agreement, WRI sold certain specified property and assets to RadioShack for $57 million, including the fixtures, information systems, training and distribution assets, and inventory "used for the operation of retail kiosks that sell and activate cell phones pursuant to the Communication Center Kiosk License Agreement by and between [WRI] and Sam's West, Inc." (Asset Purchase Agreement, Section 1.1(a)(v); attached as Tab 1 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment) RadioShack also assumed WRI's lease interest in its Arizona office complex, though RadioShack did sublease part of that complex back to WRI and WRI continued to independently operate its non-Sam's Clubs kiosk business. (Assignment and Assumption of Lease, attached as Tab 8 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment; September 30, 2004 letter, attached as Tab 7 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment; Dep IV, pp. 21-23.) WRI also terminated its agreement with Sam's Clubs, and RadioShack negotiated its own de novo License Agreement

---

[1]The Asset Purchase Agreement is attached as Exhibit L to Plaintiff's Motion for Partial Summary Judgment and as Exhibit J to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment. It is also used, but not attached as Exhibit D to RadioShack's Renewed Motion for Summary Judgment. An excerpt from the Asset Purchase Agreement is attached as Exhibit A to Plaintiff's Response to RadioShack's Renewed Motion for Summary Judgment.
RadioShack tabs different parts of the Asset Purchase Agreement in its Exhibit J. Plaintiff provides the tab numbers for parts of the agreement at the beginning of her Exhibit L, but her Exhibit is not actually tabbed. Therefore, for ease of reference, all cites by the Court to the Asset Purchase Agreement will be cites to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment.

with Sam's Clubs. (Release and Termination Agreement, attached as Tab 3 to Exhibit J of RadioShack's Response to Plaintiff's Partial Motion for Summary Judgment)

Under Section 6.4 of the Asset Purchase Agreement, WRI and RadioShack further agreed that, effective September 30, 2004, WRI would terminate the employment of employees identified in Schedule 3.7 to the Agreement and that RadioShack would offer employment to each of those specified individuals the next day subject to their passing a background check and RadioShack's normal hiring policies. (Asset Purchase Agreement, § 6.4, attached as Tab 1 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment) WRI employees who were not assigned to Sam's Club kiosks were not included in the transfer of eligible employees and none of them became RadioShack employees. (Dep III, pp. 60-61; Dep IV, pp. 67-68) Moreover, in an accompanying "Transition Agreement", WRI agreed it would retain a certain number of "Transitional Employees" for up to ninety-days at a prorated cost to both WRI and RadioShack for the purpose of assisting in the smooth transfer of the purchased assets. (Transition Agreement, ¶ 23, attached as Tab C to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment) Among WRI's executive management team, only Chief Operating Officer Paul Elliot became a RadioShack employee, but he only briefly worked at RadioShack and his position was very different from the position he held with WRI. (Dep IV, pp. 52-54, 62-64)

The Asset Purchase Agreement expressly excluded from the sale WRI's rights in its subsidiaries as well as WRI's articles of incorporation, minute books, corporate records, bank accounts or lock boxes, securities held, insurance policies, and any benefit plans relating to

WRI's business.  (Asset Purchase Agreement, § 1.1(b), attached at Tab 1 to Exhibit J of

RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment)  Moreover, under

the heading "Excluded Liabilities," the Asset Purchase Agreement provided that the parties

acknowledged and agreed that RadioShack was not assuming and was not be responsible for any

liability relating to the any claims or obligations relating to any employee of WRI and not

expressly assumed by RadioShack in the agreement, any liability of WRI to a shareholder of

WRI or related person, any liability arising out of any proceeding pending as of the date of the

agreement, and any liability arising out of or resulting from WRI's compliance or

noncompliance with any legal requirements.  (Asset Purchase Agreement, § 1.2(b), attached as

Tab 1 to Exhibit J of RadioShack's Motion for Partial Summary Judgment)  Schedule 3.4 of the

Agreement specifically identifies 76 pending lawsuits or EEOC Charges against WRI, including

plaintiff's, as among the excluded liabilities.  (Asset Purchase Agreement, Schedule 3.4; attached

as Tab 2 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary

Judgment and as Exhibit A to Plaintiff's Response to RadioShack's Renewed Motion for

Summary Judgment)

   In Section 3.19 of the Asset Purchase Agreement, WRI verified that "based on a

reputable third party's opinion and [WRI's] review, WRI believes that [RadioShack] is paying

fair value, in an arms'-length transaction for the Purchased Assets" and that "immediately after

giving effect to the consummation of the transactions contemplated by this Agreement, WRI will

not have unreasonably small capital with which to conduct its present or proposed business."

(Asset Purchase Agreement, § 3.19, attached as Tab 1 to Exhibit J of RadioShack's Response to

Plaintiff's Motion for Partial Summary Judgment)  That assurance was further verified by a letter from the third-party auditor, MCA Financial Group, Ltd., attached to the Asset Purchase Agreement (September 30 2004 letter, attached as Tab 6 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment)

Within months of the Asset Purchase Agreement, RadioShack replaced all of WRI's kiosks with new physical structures of its own design.  (Dep IV, pp. 47-48)  RadioShack also closed the office center in Arizona and laid off its employees as soon as it was able to consolidate the center's functions at RadioShack's own preexisting operations facility in Texas. (Dep III, pp. 39-40; Dep IV, p. 23)

In March 2005, WRI answered plaintiff's interrogatories and indicated that an insurance policy was in existence at the time of the alleged discrimination and that, under the terms of the policy, the insurer would be liable.  (WRI's Answers to Plaintiff's First Interrogatories, attached as Exhibit M to Plaintiff's Motion for Partial Summary Judgment and as Exhibit B to Plaintiff's Response to RadioShack's Motion for Summary Judgment)

On July 28, 2005, WRI filed a motion for summary judgment on the basis that there was no genuine issue of material fact and it was entitled to judgment as a matter of law.  (D/E #35) On January 30, 2006, the Honorable Paul V. Gadola held a hearing on that motion and, subsequently, denied WRI's motion for summary judgment.  (D/E #46)

According to plaintiff, at the January 30, 2006 hearing, counsel for WRI informed plaintiff that WRI was "out of business" and that he would be filing a motion to withdraw as counsel.  On February 10, 2006, counsel for WRI filed a motion to withdraw as counsel,

indicating that WRI no longer has the means of paying for counsel and has ceased to exist as an ongoing entity. Counsel also indicated that WRI has "no intention of defending or otherwise retaining representation with respect to any further proceedings in this action." (Motion to Withdraw as Defense Counsel, D/E #49) On February 14, 2006, Judge Gadola entered an order granting the motion to withdraw. (D/E #53)

On February 10, 2006, plaintiff filed a motion for leave to amend her complaint in order to add RadioShack as a successor corporation. (D/E #50) In that motion, plaintiff argued that she was informed for the first time on January 30, 2006 that WRI was uninsured with respect to plaintiff's claim and that WRI had been dissolved. Plaintiff requested amending the complaint because, upon information and belief, WRI had sold a portion of its business to RadioShack and the FMLA specifically allowed successor liability.

On March 24, 2006, Judge Gadola granted plaintiff's motion for leave to amend the complaint. (D/E #57) In granting that motion, Judge Gadola wrote:

> The Court, having reviewed Plaintiff's motion, accompanying brief, and the record, determines that, for reasons stated in the motion and its accompanying brief, the Court will grant the relief requested. *See* Fed. R. Civ. P. 15 (instructing that "leave shall be freely given when justice so requires") *and* 29 U.S.C. § 2611(a)(A)(ii)(II) (providing for liability of "any successor in interest of an employer.").

On September 14, 2006, RadioShack filed a motion for summary judgment. (D/E #72) In that motion, RadioShack argues that RadioShack is not a "successor in interest" to WRI for the purposes of Plaintiff's particular claims of intentional discrimination by WRI and that plaintiff's claims against RadioShack are barred by the applicable statutes of limitation.

On March 30, 2007, Judge Gadola denied RadioShack's motion for summary judgment because it was premature. (D/E #77) A discovery plan and scheduling order were subsequently issued. (D/E #79, #80)

Further facts will be included in the discussion section as needed.

### B. Motions before the Court

**1. Plaintiff's Motion for Partial Summary Judgment (D/E #100)**

On November 2, 2007, plaintiff moved for partial summary judgment on the issue of successor liability. (D/E #100) In that motion, plaintiff argues that RadioShack is a successor in interest with respect to plaintiff's claims because each factor of the multi-factor test for successor liability weighs in favor of imposing such liability in this case. Those factors include RadioShack's continuing of WRI's business operations with the same locations, work force, equipment, products and services, and the fact that RadioShack had notice of plaintiff's claims.

On January 18, 2008, RadioShack filed a response to plaintiff's motion for partial summary judgment. (D/E #113) In that response, RadioShack argues that, in this case of first impression, RadioShack is not WRI's successor for purposes of plaintiff's FMLA or ELCRA claim because the relevant factors weigh against imposing such liability and the over-arching balancing test compels a decision in favor of RadioShack. RadioShack specifically notes, among other factors, that it only purchased a portion of WRI's business and WRI continued with its remaining kiosk businesses, that the asset purchase agreement specifically excluded assumption of liability for plaintiff's claims, and that plaintiff's joint employer could have provided relief if sued by plaintiff.

On January 22, 2008, plaintiff filed a reply to RadioShack's response to plaintiff's motion for partial summary judgment. (D/E #115) In that reply, plaintiff argues that this case is not one of first impression, as argued by RadioShack. Plaintiff also argues that there is no evidence supporting RadioShack's assertions that the exclusion of plaintiff's claims was reflected in the purchase or that finding in favor of plaintiff would chill commerce. In the reply, plaintiff also reiterates why the factors for determining successor liability weigh in her favor, specifically noting that no evidence suggests imposing any liability on CNA.

**2. RadioShack's Renewed Motion for Summary Judgment (D/E #114)**

On January 18, 2008, RadioShack filed a renewed motion for summary judgment. (D/E #114) In that motion, RadioShack argues that plaintiff's claim is barred by the applicable statute of limitations and by the equitable doctrine of laches. RadioShack also argues that, as a matter of law, it is not a successor in interest for WRI with respect to plaintiff's claims. In making that last argument, RadioShack refers to and relies on its brief in response to plaintiff's motion for partial summary judgment.

On February 7, 2008, plaintiff filed a response to RadioShack's renewed motion for summary judgment. (D/E #117) In that response, plaintiff argues that her claims are not barred by the statute of limitations because the amended complaint relates back to the original, timely filed complaint. Plaintiff also argues that her claims are not barred by the doctrine of laches because neither WRI nor RadioShack informed plaintiff of the asset purchase agreement, despite the fact that plaintiff was involved in ongoing litigation with WRI, and she timely filed an

amended complaint once she learned of the relevant facts.  Plaintiff further argues that the

factors used in determining successor liability compel a finding of successor liability in this case.

On February 15, 2008, RadioShack filed a reply in support of its motion for summary

judgment.  (D/E #118)  In that reply, RadioShack argues that there is no need for a successor

liability analysis where plaintiff could have brought a claim against CNA, her joint employer

along with WRI.  RadioShack also argues that the asset purchase agreement was well publicized.

RadioShack further argues that the cases plaintiff cites to with respect to RadioShack's statute of

limitations arguments are irrelevant given that those cases do not involve statutes of limitations.

### III. Standard of Review

Both plaintiff and RadioShack move for summary judgment pursuant to Fed. R. Civ. P.

56.  Fed. R. Civ. P. 56(b) provides that "[a] party against whom a claim, counterclaim, or cross-

claim is asserted or a declaratory judgment is sought may, at any time, move without or without

supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).

In deciding a motion for summary judgment, the court must view the evidence and draw

all reasonable inferences in favor of the non-movant.  See Matsushita Electric Industrial Co.,

Ltd. et al. v. Zenith Radio Corp., et. al., 475 U.S. 547, 587, 106 S.Ct. 1348, 1356 (1986); see also

B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 591-92 (6th Cir. 2001).  The moving party

bears the initial burden of demonstrating the absence of a genuine issue of material fact. Once

the moving party has carried his burden, the party opposing the motion "must come forward with

specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587, 106

S.Ct. 1348. The opposing party cannot merely rest upon the allegations contained in his

pleadings. Rather, he must submit evidence demonstrating that material issues of fact exist.

Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003); Fed. R. Civ. P. 56(e).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct. 1348

(quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575,

1592 (1968)).

## IV. Discussion

### A. Successor Liability

An employee can sue her employer for violations of the FMLA and the definition of

"employer" for that statute includes an "successor in interest to an employer." 29 U.S.C. §

2611(4)(A)(ii)(II), § 2617(a). In EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086

(6th Cir. 1974), the Sixth Circuit laid the framework for a multi-factor approach for successor

liability that would subsequently be adopted in several circuits and codified in the FMLA's

regulations. Cobb v. Contract Transport, Inc., 452 F.3d 543, 554 -555 (6th Cir. 2006).[2] See also

---

[2]Both plaintiff and RadioShack agree that the analysis for successor liability under
ELCRA is the same as that for the FMLA. (Plaintiff's Brief in Support of her Motion for Partial
Summary Judgment, p. 8 n. 4; RadioShack's Brief in Response to Plaintiff's Motion for Partial
Summary Judgment, pp. 19-20) See also Stevens v. McLouth Steel Prods. Corp., 433 Mich. 365,
371-378 (Mich. 1989) (citing MacMillan, 503 F.2d at 1091-1092 with approval). Given that the
test is the same, this Court will only refer to the FMLA in its Report and Recommendation.

<u>Grace v. USCAR</u>, 521 F.3d 655, 672 (6th Cir. 2008). The panel in that case gathered labor case

law and:

> distilled from it the following factors, which it held were relevant
> to the imposition of successorship liability: (1) whether the
> successor company has notice of the charge; (2) the ability of the
> predecessor to provide relief; (3) whether the new employer uses
> the same plant; (4) whether there has been substantial continuity of
> business operations; (5) whether the new employer uses the same
> or substantially same workforce; (6) whether the new employer
> uses the same or substantially same supervisory personnel; (7)
> whether the same jobs exist under substantially the same working
> conditions; (8) whether [the defendant] uses the same machinery,
> equipment and methods of production; and (9) whether [the
> defendant] produces the same product. [<u>Cobb</u>, 452 F.3d at 554,
> citing <u>MacMillan</u>, 503 F.2d at 1094.]

This multi-factor approach has since been codified in the FMLA's implementing regulations, 29

C.F.R. § 825.107.[3]

---

[3]29 C.F.R. § 825.107 provides, in the relevant parts:

(a) For purposes of FMLA, in determining whether an employer is covered because it is a "successor in interest" to a covered employer, the factors used under Title VII of the Civil Rights Act and the Vietnam Era Veterans' Adjustment Act will be considered. However, unlike Title VII, whether the successor has notice of the employee's claim is not a consideration. Notice may be relevant, however, in determining successor liability for violations of the predecessor. The factors to be considered include:

(1) Substantial continuity of the same business operations;
(2) Use of the same plant;
(3) Continuity of the work force;
(4) Similarity of jobs and working conditions;
(5) Similarity of supervisory personnel;
(6) Similarity in machinery, equipment, and production methods;
(7) Similarity of products or services; and
(8) The ability of the predecessor to provide relief.
(b) A determination of whether or not a "successor in interest" exists is not determined by the application of any single criterion, but rather the entire circumstances are to be viewed in their totality.

However, the nine factors listed in MacMillan and adopted in 29 C.F.R. § 825.107 are not in themselves the test for successor liability and all nine factors will not be applicable to every case. Cobb, 452 F.3d at 554. Instead, "the labor law concept of successor liability requires courts to balance the equities of imposing a particular legal obligation in a particular situation, considering 1) the interests of the defendant-employer, 2) the interests of the plaintiff-employee, and 3) federal policy embodied in the relevant federal statutes." Cobb, 452 F.3d at 554-555. See also Grace v. USCAR, 521 F.3d 655, 672 (6th Cir. 2008) (stating that the factors are only part of an "overarching, three-part test considering the equities of imposing a particular legal obligation on a successor: (1) the interests of the plaintiff-employee, (2) the interests of the defendant-employer, and (3) the federal policy goals of the statute.") "Whether a particular factor is relevant depends on the legal obligation at issue in the case. The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." Cobb, 452 F.3d at 554.

**1. Factors in Determining Successor Liability**

**a. Notice**

As noted above, one factor in determining successor liability for FMLA purposes is whether the successor company has notice of the claim. 29 C.F.R. § 825.107(a); Cobb, 452 F.3d at 554.[4] In this case, RadioShack undisputably had notice of plaintiff's claim as that claim was

---

[4]While listed as a factor for determining successor liability in MacMillan, 503 F.2d at 1094, notice is not enumerated as such in 29 C.F.R. § 825.107. However, the opening paragraph of 29 C.F.R. § 825.107(a) expressly states that notice "may be relevant . . . in determining successor liability for violations of the predecessor" and the Sixth Circuit, in Cobb, 452 F.3d at 554, specifically identified notice as a factor for determining successor liability in FMLA cases.

specifically referenced in the Asset Purchase Agreement.  As discussed above, Schedule 3.4 of

the Asset Purchase Agreement specifically identifies plaintiff's lawsuit as among the liabilities

not assumed by RadioShack.  (Schedule 3.4; attached as Tab 2 to Exhibit J of RadioShack's

Response to Plaintiff's Motion for Partial Summary Judgment)  The parties do, however, dispute

the effect of that notice and disclaimer of liability.  According to plaintiff, she was powerless in

the transaction of assets and, while RadioShack could have protected itself through a lower

purchase price or an indemnification clause, RadioShack cannot avoid successor liability by

merely putting a disclaimer of liability in the Asset Purchase agreement.  According to

RadioShack, because it expressly agreed with WRI that RadioShack would not assume any

liability for plaintiff's claims, among others, and that agreement affected the purchase price of

the transaction, RadioShack is not a successor in interest for plaintiff's claim.

Both the United States Supreme Court and the Sixth Circuit have indicated that potential

liability as a successor could be reflected in the business' purchase price.  See Golden State

Bottling Co., Inc. v. N.L.R.B., 414 U.S. 168, 185, 94 S.Ct. 414, 425 (U.S. 1973) (reasoning that,

since the successor must have notice before liability can be imposed, 'his potential liability for

remedying the unfair labor practices is a matter which can be reflected in the price he pays for

the business)[5]; Cobb, 452 F.3d at 553 (citing Golden State Bottling Co. for the same proposition

in an FMLA case).  See also Musikiwamba v. ESSI, Inc., 760 F.2d 740, 752 (7th Cir. 1985)

(stating that, in a federal race discrimination case, the "basis of the notice requirement is that the

_____

[5]In Golden State Bottling Co. the Supreme Court extended successor liability from
negotiations and the imposition of collective bargaining agreements to liability for unfair labor
practices.  414 at 172.  In that case, the defendant was found to be the bona fide purchaser of and
successor in interest to a business that had committed an unfair labor practice by discharging an
employee.  Id., 414 U.S. at 171-172.

successor has some time to negotiate a change in the purchase agreement to reflect the potential

liability of a lawsuit."); <u>Trujillo v. Longhorn Mfg. Co., Inc.</u>, 694 F.2d 221, 225 (10th Cir. 1982)

(finding, in a federal sex discrimination case, that, because the successor has notice of the EEOC

complaint, it could have provided for its nonliability); <u>Korlin v. Chartwell Health Care, Inc.</u>, 128

F.Supp.2d 609, 614 (E.D. Mo. 2001) (noting, in a federal age discrimination case, that a

successor's potential liability is a matter which can be reflected in the price he pays for the

business); <u>Stevens v. McLouth Steel Products Corp.</u>, 433 Mich. 365, 376 (Mich. 1989) (stating,

in an age discrimination case brought pursuant to Michigan's civil rights act, that the successor

doctrine is derived from equitable principles and it would be grossly unfair to impose successor

liability where the successor did not have the opportunity to protect itself by an indemnification

clause in the acquisition agreement or a lower purchase price).

 Here, regarding the effect of a liability on the purchase price, plaintiff appears to assume

that RadioShack could only pay less in exchange for potentially assuming liability while

RadioShack appears to be arguing that it actually paid more in exchange for not assuming

liability.[6]  While the Tenth Circuit has stated, without any reasoning, that a successor can

provide for its nonliability in the sales agreement, <u>Trujillo</u>, 694 F.2d at 225, and the Michigan

Supreme Court has noted, without any reasoning, that a successor could protect itself from any

_____

 [6]Plaintiff also argues that RadioShack could have protected itself by securing an
indemnification clause through which WRI would indemnify it for any liability arising from
WRI's unfair labor practices.  <u>See</u> <u>Golden State Bottling Co.</u>, 414 U.S. at 168; <u>Stevens</u>, 433
Mich. at 376; <u>Trujillo</u>, 694 F.2d at 225.  However, this Court would note that the Asset Purchase
Agreement does provide that WRI would indemnify RadioShack for any liability arising out of
the excluded liabilities.  (Asset Purchase Agreement, § 7.2(b), attached at Tab 1 to Exhibit J of
RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment)  Presumably, the
indemnification clause does not help RadioShack now because WRI has no money.

potential liability through a lower purchase price, <u>Stevens</u>, 433 Mich at 376. The other cases cited above, including the Sixth Circuit in <u>Cobb</u>, merely state that the potential liability may be reflected in the purchase price and there is no discussion of whether a successor can pay less given that there is the potential for liability, pay more in exchange for not assuming liability, or both.

As a preliminary matter, this Court would note there is no evidence in the record that demonstrates that the disclaimer of liability had any effect on the purchase price outside of the finding by third party that the Asset Purchase Agreement constituted an arms-length transaction. In any event, the implication from the cases cited above is that, while a successor can protect itself by paying a lower purchase price, it cannot disclaim liability by purportedly paying a higher purchase price. RadioShack provides no support for that proposition that a successor can disclaim any potential liability through a contract outside of an unsupported statement in a Tenth Circuit case while <u>Cobb</u>, as well as the majority of the cases cited above, provides that the purchase price can reflect the potential liability, not that the parties can eliminate the potential liability altogether. Moreover, the successor's ability to protect itself by having the purchase price reflect the potential liability was discussed in <u>Cobb</u> along with indemnification and indemnification is only relevant if the successor has assumed liability. This Court therefore finds that application of the notice factor supports the imposition of successor liability. RadioShack clearly had notice of plaintiff's claim and, while RadioShack's attempted to disclaim liability in the Asset Purchase Agreement, that disclaimer cannot bar plaintiff's claim.[7]

_____

[7]As discussed below, while RadioShack's attempt to disclaim liability appears to be ineffective, the attempt to disclaim liability may be a factor in determining the equity of imposing successor liability.

### b. Ability of Predecessor to Provide Relief

Another factor in determining successor liability for FMLA purposes is the ability of the predecessor to provide relief. 29 C.F.R. § 825.107(a)(8); Cobb, 452 F.3d at 554. In plaintiff's view, this factor weighs in favor of finding successor liability because WRI has no apparent ability to provide relief and it is clear that the inability to provide relief was intentionally obscured from plaintiff by WRI continuing to take part in action. In RadioShack's view, this factor weighs against finding successor liability because WRI retained the ability to provide relief following the Asset Purchase Agreement. In support of its argument, RadioShack cites to both the $57 million WRI received from the Asset Purchase Agreement as well as the voluntary facilitation that WRI engaged in, after the sale, regarding the potential settlement of plaintiff's claim.[8]

The parties therefore dispute what time period the Court should look at in determining whether the predecessor has the ability to provide relief. While neither party points to any dispositive cases on this issue, this Court finds that it is not limited to looking at WRI's ability to provide relief at the time immediately following the sale as argued by RadioShack. As stated in MacMillan, "The primary concern [of successor liability] . . . is to provide the discriminatee with full relief. Such relief may be awarded against the successor. On the other hand, the amenability of the predecessor to suit and its ability to provide relief will be a necessary inquiry."

---

[8]As noted by RadioShack, on May 3, 2005, WRI and plaintiff underwent a facilitation. (January 11, 2008 letter; attached as Exhibit N to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment and as Exhibit I to its Motion for Summary Judgment) According to RadioShack, WRI thus incurred the expense of participating in voluntary facilitation and plaintiff could have had a remedy had the parties reached agreement. This Court would note that nothing in RadioShack's evidence demonstrates the cost of that facilitation.

MacMillan, 503 F.2d at 1092. Given that primary concern, the Court should examine WRI's current ability to provide relief.[9]

In addition to arguing that the Court should only look at WRI's ability to provide relief at the time immediately following the Asset Purchase Agreement, RadioShack also argues that plaintiff was a joint employee of WRI and another company and that plaintiff should have sought relief from her other employer prior to seeking relief from RadioShack. On October 22, 2000, plaintiff signed a "Co-Employee Notice and Agreement" acknowledging that she was a co-employee of WRI and CNA Unisource, Inc. ("CNA").[10] As part of that agreement, plaintiff agreed to immediately contact CNA's Human Resource Department if she was subjected to any type of discrimination. In her signed declaration, however, plaintiff stated that CNA only printed her checks for a period of time, a period which ended sometime between September 2001 and May 2002, and at no time was CNA involved with plaintiff's work or plaintiff herself.[11]

---

[9]This Court would note that, regarding the appropriate time to look at, the Seventh Circuit has stated that the predecessor's ability to provide some relief prior to the transfer is also a factor to be considered in determining if successor liability should be imposed. Musikiwamba, 760 F.2d at 750. In that case, the Seventh Circuit reasoned that the public has a substantial interest in the free transfer of capital and the reorganization of unprofitable businesses, and that imposing liability on a successor when a predecessor could have provided no relief whatsoever is likely to severely inhibit the reorganization or transfer of assets of a failing business. Musikiwamba, 760 F.2d at 750-51. The Seventh Circuit also observed that, just as an employee should not be made worse off by a change in the business, neither should an employee be made better off. Musikiwamba, 760 F.2d at 750-751. In this case, even if the Court was to find the Seventh Circuit's opinion persuasive, there is no evidence in the record regarding WRI's ability to provide relief prior to the Asset Purchase Agreement.

[10]The "Co-Employee Notice and Agreement" is attached as Exhibit B to RadioShack's Brief in Response to Plaintiff's Motion for Partial Summary Judgment.

[11]Plaintiff's Declaration, January 23, 2008; identified as Exhibit Z to her Reply to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment, but entered as its own docket entry (D/E #116).

That signed agreement and plaintiff's declaration are the only evidence submitted by the parties regarding CNA and there is no evidence of CNA's relationship with WRI or its ability to provide relief. Given that scarcity of evidence, this Court finds that CNA has no effect on plaintiff's ability to bring this action or the Court's analysis of the predecessor's ability to provide relief.

In this case, it is undisputed that WRI is unable to provide plaintiff with any relief. Given that inability and the primary concern of the successor liability doctrine, the application of this factor supports the imposition of successor liability on RadioShack.[12]

### c. Continuity of Business Operations

A third factor used in determining successor liability for FMLA purposes is whether there has been a substantial continuity of the same business operations. 29 C.F.R. § 825.107(a)(1); Cobb, 452 F.3d at 554. As discussed below, this factor weighs in finding successor liability.

RadioShack purchased WRI's Sam's Club kiosk operations and the discussion of this factor, as well as several others discussed below, raises the issue of how large WRI's Sam Club's kiosk program was in relation to the rest of the kiosk operations. While it is not entirely clear from the record, it appears that the Sam's Club kiosks comprised a majority of WRI's business in light of the statement of WRI's counsel and the number of employees who transferred to RadioShack. Following the Asset Purchase Agreement, WRI's counsel sent an e-mail to plaintiff stating that WRI sold "a majority of its operations specifically the Sam's Club operations." (February 9, 2006 e-mail, attached as Exhibit W to Plaintiff's Motion for Partial Summary

---

[12]While the Court is not limited to looking at WRI's ability to provide relief at the time of the sale, the evidence cited to by RadioShack regarding WRI's ability to provide relief for over a year following the sale may be a factor in determining the equity of imposing successor liability.

Judgment and as Exhibit C to Plaintiff's Response to RadioShack's Renewed Motion for Summary Judgment)  Moreover, WRI employed an estimated 3,500 to 4,000 employees in the summer of 2004 (Dep V, pp. 7-8) and an estimated 2,400 employees transferred to RadioShack (Dep III, pp. 7-9).

In addition to having purchased what appears to be a majority of WRI's business and hiring of the majority of WRI's employees RadioShack also purchased the fixtures, information systems, training assets, distribution center and assets, customer lists and inventory of WRI. (Asset Purchase Agreement, Section 1.1(a)(v); attached as Tab 1 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment)  RadioShack also assumed WRI's lease interest in its Scottsdale, Arizona office complex, (Assignment and Assumption of Lease, attached as Tab 8 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Summary Judgment)  Given the extent and content of those purchases, the Asset Purchase Agreement itself suggests that RadioShack substantially continued WRI's business.

RadioShack primarily argues that there was not a substantial continuity of WRI's business given that it negotiated its own License Agreement with Sam's Club, WRI's employees only became temporary employees and that RadioShack eventually closed the corporate headquarters it purchased from WRI.  However, it never identifies any specific changes made in the conducting of the operation of the Sam's Club kiosks outside of physical changes to the kiosks themselves and, in light of the evidence highlighted by plaintiff, the Court finds that this factor weighs in favor of the imposition of successor liability.

**d. Plant**

A fourth factor used in determining successor liability for FMLA purposes is whether the new employer uses the same plant. 29 C.F.R. § 825.107(a)(2); <u>Cobb</u>, 452 F.3d at 554. Given the nature of the business at issue here, kiosks operated in shopping malls and other retailers, this factor may not be applicable because WRI never had a single plant. However, to the extent that this factor is applicable in this case, it appears to weigh in favor of finding successor liability given that RadioShack purchased all the Sam's Club kiosks, the WRI corporate headquarters[13] and WRI's interest in its distribution center.

**e. Workforce**

A fifth factor used in determining successor liability for FMLA purposes is whether there is a continuity of the workforce. 29 C.F.R. § 825.107(a)(3); <u>Cobb</u>, 452 F.3d at 554. As discussed above, RadioShack began employing WRI employees who worked at the Sam's Club kiosks and those employees constituted a majority of WRI's employees at the time of the Asset Purchase Agreement. On the basis of that evidence, plaintiff argues RadioShack uses substantially the same workforce as WRI did. Rather than focusing on the number of WRI employees who began working at RadioShack, RadioShack notes that plaintiff worked at a number of different locations, including non-Sam's Club locations, and there is no evidence that plaintiff would have become a RadioShack employee had she been working at WRI at the time of the Asset Purchase Agreement. According to RadioShack, that lack of evidence support the view that RadioShack is not a successor to any liability arising from plaintiff's claim, regardless

---

[13]RadioShack did ultimately close the building that housed WRI's corporate headquarters and merged the operations conducted there with a pre-existing facility in Texas. (Dep III, pp 39-40)

of whether it would be a successor in interest with respect to any claims of employees who did become RadioShack employees.

As the Sixth Circuit recognized in <u>Cobb</u>, balancing the equities may result in different conclusions as to whether successor liability may exist for different legal obligations and the relevant factual inquiries may also differ depending on the legal duty at issue. <u>Cobb</u>, 452 F.3d at 555. <u>See</u> <u>also</u> <u>Grace</u>, 521 F.3d at 672 n. 15. However, the language used in 29 C.F.R. § 825.107(a)(3) and <u>Cobb</u>, 452 F.3d at 554 clearly relates to the continuity of work force as a whole. To the extent the Court will look at plaintiff's specific situation, it will do so when balancing the equities below. The evidence provided supports plaintiff's position that RadioShack used substantially the same workforce as WRI with respect to the operation of the Sam's Club kiosks and, therefore, this factor supports the imposition of successor liability.

**f. Supervisory Personnel**

A sixth factor used in determining successor liability for FMLA purposes is the similarity in supervisory personnel. 29 C.F.R. § 825.107(a)(5); <u>Cobb</u>, 452 F.3d at 554. In this case, this factor does not necessarily support either party position. As noted by plaintiff, in general WRI's sales supervisors transferred as part of the transaction. (Dep III, p. 47) As noted by RadioShack, no officer of privately held WRI became an officer of publicly traded RadioShack, and among WRI's executive management team, only Chief Operating Officer Paul Elliot became a RadioShack employee and he only briefly worked at RadioShack in a different position than he held with WRI. (Dep IV, pp. 52-54, 62-64) Given that evidence regarding the similarity of

supervisory personnel at varying levels of authority, this factor does not weigh in favor of either parties' position.[14]

### g. Working Conditions

A seventh factor used in determining successor liability for FMLA purposes is similarity of jobs and working conditions. 29 C.F.R. § 825.107(a)(4); Cobb, 452 F.3d at 554.

As discussed above and as noted by plaintiff, the Asset Purchase Agreement granted RadioShack the rights to the kiosks, the property associated with the kiosks, the inventory and software/hardware utilized by WRI in selling at the kiosks. Moreover, given the substantial continuity in business practices discussed above, it is logical to assume that WRI's former employees continued the same jobs under the same working conditions when they started with RadioShack. RadioShack does not address this factor, apparently believing that it is not relevant to this case. To the extent it is relevant, the seventh factor identified in MacMillan supports the imposition of successor liability.

### h. Machinery, Equipment and Methods of Production

An eighth factor used in determining successor liability for FMLA purposes is similarity of machinery, equipment and methods of production. 29 C.F.R. § 825.107(a)(6); Cobb, 452 F.3d at 554. Given the nature of the business at issue here, this is not necessarily applicable because WRI did not necessarily have machinery or methods of production. However, to the extent that

_____

[14]In discussing the similarity of supervisory personnel, RadioShack also argues that no WRI supervisor of Finnerty at any time in her WRI employment became a supervisor for RadioShack. However, as with the similarity of the work force factor, the language used is used in relation to the similarity of supervisory personnel factor in 29 C.F.R. § 825.107(a)(5) and Cobb clearly relates to the companies as a whole and not to the specific supervisors of plaintiff.

this factor is applicable in this case, it appears to weigh in favor of finding successor liability given the extent and content of the Asset Purchase Agreement.

### I. Product or Services

A ninth factor used in determining successor liability for FMLA purposes is similarity of product or services. 29 C.F.R. § 825.107(a)(7); Cobb, 452 F.3d at 554. In this case, plaintiff does not devote much space discussing this factor but she argues that it is clear that RadioShack was offering the same products and services that WRI had. RadioShack does not specifically address this factor. As discussed above, this Court finds that RadioShack has substantially continued WRI's business and, in light of that finding as well as the broad range of what RadioShack purchased in the Asset Purchase Agreement, it appears that similar products and services were sold. Therefore, this factor weighs in favor of finding successor liability.

### 2. Balancing Test

As discussed above, the nine factors listed in MacMillan and adopted in 29 C.F.R. § 825.107 are not in themselves the test for successor liability and, instead, "the labor law concept of successor liability requires courts to balance the equities of imposing a particular legal obligation in a particular situation, considering 1) the interests of the defendant-employer, 2) the interests of the plaintiff-employee, and 3) federal policy embodied in the relevant federal statutes." Cobb, 452 F.3d at 554-555. The nine factors are simply factors courts have considered when applying the three prong balancing approach, considering the defendant's interests, the plaintiff's interests, and federal policy. Cobb, 452 F.3d at 554.

As recognized in Cobb, balancing the equities may result in different conclusions as to whether successor liability may exist for different legal obligations and the relevant factual

inquiries may also differ depending on the legal duty at issue.  <u>Cobb</u>, 452 F.3d at 555 (comparing

<u>Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Employees Int'l Union</u>, 417

U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) (finding that the single most important factor

when imposing the duty to arbitrate is whether the new employer employs the same employees),

with <u>Golden State Bottling Co. v. NLRB</u>, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973)

(extending successor liability to unfair labor practices, but focusing the inquiry on whether there

was a transfer of assets and substantial continuity of the business enterprise).

### a. Plaintiff's Interests

The prong of the equitable analysis relating to the employee's interest supports a finding

that RadioShack is a successor in interest to WRI for purposes of FMLA liability.  Plaintiff, of

course, has an interest in receiving relief.  Moreover, as detailed above, the regulatory factors

enumerated in 29 C.F.R. § 825.107 weigh in plaintiff's favor.  RadioShack had notice of

plaintiff's claim prior to the sale and WRI has no ability to provide plaintiff with relief.  With

respect to the Sam's Club kiosk operations at issue in the case, the operations did not change

after RadioShack took over from WRI: RadioShack had the same work sites and the majority of

WRI employees became RadioShack employees.  Similarly, the job and working conditions,

supervisory personnel, and services provided all remained the same.

### b. RadioShack's Interests

The prong of the equitable analysis relating to RadioShack's interests supports finding

that RadioShack is not a successor in interest to WRI for purposes of FMLA liability, but not to

the extent argued by RadioShack.  RadioShack's arguments regarding equity relate to the sale

itself, what happened after the sale, and the potential effect of a finding of successor liability in this case.

With respect to the sale itself, RadioShack correctly notes that the Asset Purchase Agreement specifically states that RadioShack did not assume liability for plaintiff's claim. As discussed above, this Court does not find that contractual clause dispositive on the issue of successor liability. However, the disclaimer clause appears to show RadioShack and WRI's intent in assigning liability and it would seem unfair to override that intent. Moreover, RadioShack's attempt to disclaim successor liability is not expressly contradicted in case law; the Sixth Circuit has stated that a successor's potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, Cobb, 452 F.3d at 553, and the Tenth Circuit has found that, in a federal sex discrimination case, because the successor has notice of the EEOC complaint, it could have provided for its nonliability. Trujillo, 694 F.2d at 225. However, there is no evidence that the exclusion of plaintiff's claim actually affected the purchase price in this case and a successor should not be able to avoid liability by merely so, especially where the RadioShack could have protected itself by paying a lower purchase price in addition to the indemnification clause it did secure.

Moreover, RadioShack's focuses on the fact that it had no prior relationship with WRI and that the Asset Purchase Agreement was an arms-length transaction is misplaced. As found by the Sixth Circuit, because successor liability under the FMLA derives from labor law and not corporate law, RadioShack's motivations have little bearing on the issue of successor liability. Grace, 521 F.3d at 674. In Grace, for example, the Sixth Circuit found that the district court's

finding in that case that "the change in employers was neither tactical nor likely to recur" had little bearing on the issue of successor liability. Grace, 521 F.3d at 674.

RadioShack does correctly note that, pursuant to the Asset Purchase Agreement, only certain employees were transferred to RadioShack. WRI employees who were not then assigned to Sam's Club kiosks were not included in the transfer of eligible employees and none of them became RadioShack employees. Moreover, their employment was contingent on a background check and RadioShack's normal hiring policies. Plaintiff was not working for WRI at the time of the Asset Purchase Agreement and when she did work there she worked at both Sam's Clubs and non-Sam's Clubs locations. (Dep I, pp. 21, 26) At oral argument, plaintiff's counsel asserted that plaintiff worked at Sam's Club kiosks the majority of the time, but there is no evidence of that in the record. However, it is not plaintiff's fault that the parties can only speculate regarding whether she would have become employed by RadioShack.

With respect to what happened after that sale, RadioShack argues that successor liability would be inequitable in this case because it received no benefit from any illegal action by WRI and that no one responsible for the illegal action transferred to RadioShack. In MacMillan, the Sixth Circuit found that the equities in that case favored successor liability in part because the successor benefitted from the discriminatory employment practices of its predecessor. MacMillan, 503 F.2d at 1092. In this case, there is no indication that RadioShack benefitted from any unfair labor practice. However, the United States Supreme Court did note in Golden State Bottling Co., that, if the employees identify the new employer's labor policies with those of the predecessor then the successor may benefit from the unfair labor practices due to a continuing deterrent effect. Golden State Bottling Co., Inc., 414 U.S. at 184. Nevertheless, there

is no evidence that RadioShack benefitted from any illegal labor practice in this case and, pursuant to <u>MacMillan</u>, that should weigh in favor of not imposing successor liability.

In addition to pointing out the lack of benefit to RadioShack from any illegal action, RadioShack also correctly notes that no one involved in any illegal action taken with respect to plaintiff transferred to RadioShack. As detailed above, of the managers and supervisors involved in plaintiff's termination, none transferred to RadioShack. Moreover, among WRI's executive management team, only one Officer became a RadioShack employee and he only briefly worked at RadioShack in a position different from the position he held with WRI. As noted by RadioShack, the Seventh Circuit has found that "the basic issue in every successorship case is how to strike a proper balance between on the one hand preventing wrongdoers from escaping liability and on the other hand facilitating the transfer of corporate assets to their most valuable uses." <u>E.E.O.C. v. Vucitech</u>, 842 F.2d 936, 945 (7th Cir. 1988). In this case, imposing successor liability may be inequitable because it would not prevent wrongdoers from escaping liability and would instead make an innocent party liable.

RadioShack also argues that it should not be liable because, for a long time, it appeared WRI could provide relief. According to RadioShack, WRI remained in business for more than two and a half years after plaintiiff's termination, defended this lawsuit on its own, and attempted to reach settlement with plaintiff before becoming insolvent. However, this Court would note that there is no evidence submitted regarding WRI's ability to provide relief at anytime during this case. RadioShack cites to the $57 million WRI received from the Asset Purchase Agreement, but, as found by the Tenth Circuit, a predecessor's receipt of the sale proceeds does not alone demonstrate its ability to pay the judgment when, as in this case, other

potential liabilities are not covered by the evidence.  Trujillo, 694 F.2d at 225.  RadioShack also

cites to the voluntary facilitation that WRI took part, but, as discussed above, the evidence

provided by RadioShack does not demonstrate the cost such facilitation or WRI's actual

willingness to settle the case.  (January 11, 2008 letter; attached as Exhibit N to RadioShack's

Response to Plaintiff's Motion for Partial Summary Judgment and as Exhibit I to its Motion for

Summary Judgment)  Moreover, WRI had during the course of this case indicated that an

insurance policy was in existence at the time of the alleged discrimination and that, under the

terms of the policy, the insurer would be liable (WRI's Answers to Plaintiff's First

Interrogatories, attached as Exhibit M to Plaintiff's Motion for Partial Summary Judgment and as

Exhibit B to Plaintiff's Response to RadioShack's Motion for Summary Judgment), when in fact

there was no such policy and WRI was uninsured with respect to plaintiff's claim.  (D/E #50)

Lastly, RadioShack also appears to argue that a finding of successor liability in this case

would chill commerce by discouraging employers from taking over the contracts of failing

companies.  However, the Sixth Circuit has held that the burdens imposed by FMLA and are not

significant enough to justify an avoidance of successor liability.  Grace, 521 F.3d at 674.

Moreover, as discussed above, because RadioShack had notice of plaintiff's claim, the ensuing

liability could have been reflected in the purchase price.  Golden State Bottling Co, 414 U.S. at

185; Cobb, 452 F.3d at 553.

### c. Federal Policy

As stated above, the third factor relevant to the equitable balancing is the federal policy

underlying the FMLA.  Grace, 521 F.3d at 675.  As found by the Sixth Circuit in Grace, "the

basic goals of the FMLA are 'to entitle employees to take reasonable leave for medical reasons,'

29 U.S.C. § 2601(b)(2), and to 'balance the demands of the workplace with the needs of the family.' 29 U.S.C. § 2601(b)(1)." <u>Grace</u>, 521 F.3d at 675.[15]  Moreover, the Sixth Circuit has found that:

> the FMLA's focus on the individual employee appears to warrant emphasis on [the employee's interest] prong of the equity analysis; conversely, other labor law issues implicating successor liability (e.g. collective bargaining obligations) more obviously implicate employees as a collective vis-à-vis their employer's interests, and, by extension, the [employer's interest] prong of the analysis. [<u>Grace</u>, 521 F.3d at 675.]

In general, the policies underlying the successor liability doctrine can best be effectuated by seeing to it that violations are remedied in as many cases as possible.  <u>Golden State Bottling Company</u>, 414 U.S. at 182 n. 5.  Given the FMLA's focus on the individual employee, the basis goals of the FMLA and the fact that the majority of factors from 29 C.F.R. § 825.107 weigh in favor of finding successor liability, the third prong of the equity balancing test weighs in favor of finding that RadioShack is a successor in liability to WRI for FMLA purposes.

_____

[15]Pursuant to 29 U.S.C.A. § 2601(b), the purpose of the FMLA is to

"(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;
(2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition;
(3) to accomplish the purposes described in paragraphs (1) and (2) in a manner that accommodates the legitimate interests of employers;
(4) to accomplish the purposes described in paragraphs (1) and (2) in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and
(5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause."

### d. Balancing of Equities

The test for successor liability in FMLA cases asks the court to balance the interests of the plaintiff, the interests of the successor and the federal policy embodied in the relevant federal statutes. Cobb, 452 F.3d at 554-555. In this case, plaintiff clearly has a strong interest in receiving relief and the majority of factors identified in the relevant regulation and case law weigh in favor of finding successor liability. RadioShack did attempt to disclaim liability through the Asset Purchase Agreement, but it could have protected itself in other ways and the effect of a finding of successor liability in this case will not chill commerce to a unacceptable level. RadioShack committed no illegal action in this case and it received no illegal benefit, but any decision to impose successor liability presumes that there is an innocent successor and the Court must strike a balance between the conflicting interests of the innocent successor, the public, and the victimized employee. Golden State Bottling Co., 414 U.S. at 175-77. In this case, the goals behind the FMLA and the interests of the plaintiff outweigh the interests of RadioShack and successor liability should be found.

### B. Statute of Limitations and Laches

RadioShack also argues that plaintiff's claim is barred by the applicable statute of limitations and the doctrine of laches. While those arguments are related, each will be addressed separately.

### 1. Statute of Limitations

29 U.S.C. § 2617(c)(1) provides that, in general, an action under the FMLA must be brought no "later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." However, if the plaintiff alleges an "willful violation" of the

FMLA, she would have three years from the date of the last event constituting the alleged violation for which such action is brought. 29 U.S.C. § 2617(c)(2). With respect to ELCRA, an action must be brought within three years after the time of the injury. M.C.L. § 600.5805(10).

In this case, plaintiff learned of her termination on November 4, 2002 (Dep I, pp. 93-101) and she filed her amended complaint naming RadioShack as a defendant on April 16, 2006 (D/E #58). Given that timing of the amended complaint, RadioShack argues that plaintiff's claim against it falls outside of the applicable statue of limitations because the amended complaint was filed more than three years after plaintiff learned of her termination. RadioShack rests its statute of limitations argument on its assertion that, while labeled an amended complaint, plaintiff's amended complaint was actually a supplemental pleading and supplemental pleadings cannot relate back to the original pleading for purposes of a statute of limitation.

This Court agrees with RadioShack that the amended pleading is more properly classified as a supplemental pleading under Fed. R. Civ. P. 15(d) than as an amended pleading under Fed. R. Civ. P. 15(a). A supplemental pleading is one which sets forth "transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed. R. Civ. P. 15(d). Plaintiff filed her complaint against WRI on July 21, 2004. (See Notice of Removal, D/E #1) The Asset Purchase Agreement, the event which led to the amended complaint, was not entered into until October 1, 2004. (Asset Purchase Agreement, attached as Exhibit J to RadioShack's Response to Plaintiff's Motion for Summary Judgment) Therefore, it would appear that the plaintiff's amended complaint is technically a supplemental pleading. See Fed. R. Civ. P. 15(d).

While this Court agrees that plaintiff's amended pleading was actually a supplemental pleading, it disagrees with RadioShack's argument that a supplemental pleading cannot relate back to the original pleading. According to RadioShack, Fed. R. Civ. P. 15 does not provide that supplemental proceedings can relate back to the original pleading and, therefore, plaintiff's complaint against it is barred by the statute of limitations. However, while Fed. R. Civ. P. 15 does not expressly address whether supplemental pleadings may relate back to the original pleadings, it does not forbid it and the distinction between an amended pleading and a supplemental pleading is often disregarded for purposes of relation back under Rule 15(c). See 6A Charles A. Wright *et al.*, Federal Practice and Procedure § 1508 (2008). See also See, *e.g.*, F.D.I.C. v. Knostman, 966 F.2d 1133, 1138-1139 (7th Cir. 1992); Keith v. Volpe, 858 F.2d 467, 473-476 (9th Cir. 1988); Davis v. Piper Aircraft Corp., 615 F.2d 606, 609 n. 3 (4th Cir. 1980); Junso Fujii v. Dulles, 224 F.2d 906, 906-907 (9th Cir. 1955). Among the courts that have disregarded the distinction between amendments and supplements for purposes of relation back is one in this district, where the Honorable Robert Cleland has utilized the relation back provisions of Fed. R. Civ. P. 15(c) with respect to a supplemental pleading. Bromley v. Michigan Educ. Ass'n, 178 F.R.D. 148, 156 (E.D. Mich. 1998) (Cleland, J.) Therefore, this Court rejects RadioShack's argument that, if plaintiff's amended complaint is deemed a supplemental pleading, it cannot relate back to the original complaint.

In the alternative, plaintiff's amended complaint could be seen as alleging an entirely new cause of action against RadioShack based on facts different than those in the original complaint. The FMLA authorizes actions against an "employer" and defines "employer" to include a "any successor in interest of an employer." 29 U.S.C. § 2617(a); 29 U.S.C. §

2611(4)(a)(ii)(II). To prevail on a claim against a successor in interest of an employer, in addition to proving the underlying FMLA violation, a plaintiff would also have to show that the balance of equities favors the imposition of successor liability. Cobb, 452 F.3d at 554-555. Therefore, a claim against a successor in interest differs from a claim against an original employer in what must be shown and plaintiff could be seen as asserting a new cause of action in her amended complaint. To the extent plaintiff is deemed to have asserted a new cause of action, then plaintiff would have two years to from the date of the last event constituting the alleged violation. 29 U.S.C. § 2617(c)(1). In this case, the last event constituting the alleged violation by RadioShack would have been the Asset Purchase Agreement given that plaintiff would not have had an FMLA claim against prior to RadioShack prior to that sale. Plaintiff filed her claim against RadioShack within two years of the Asset Purchase Agreement and, therefore, it would not be outside of the applicable statute of limitations.

This Court would also note that, if RadioShack's interpretation of Fed. R. Civ. P. 15 is accepted, then the goals and provisions of the FMLA would be frustrated. As noted above, the Sixth Circuit has found that "the basic goals of the FMLA are 'to entitle employees to take reasonable leave for medical reasons,' 29 U.S.C. § 2601(b)(2), and to 'balance the demands of the workplace with the needs of the family.' 29 U.S.C. § 2601(b)(1)." Grace, 521 F.3d at 675. To effectuate those goals, the FMLA expressly identifies "any successor in interest of an employer" as an entity that can be sued. 29 U.S.C. § 2617(a); 29 U.S.C. § 2611(4)(a)(ii)(II). However, if RadioShack's interpretation of Fed. R. Civ. P. 15 was accepted, any claim against a successor in interest would fall outside of the statute of limitations if the purchase occurred after the expiration of the statute of limitations, even if the plaintiff had filed a timely complaint

against the original employer. While such a situation did not occur in this case, where the purchase occurred within three years of the alleged violation, such a situation would be contrary to the FMLA's goals and the potential for such a situation occurring compels this Court's conclusion. If a supplemental pleading alleges additional facts arising out of the original claim, then it may relate back to the original pleading. If the supplemental pleading asserts a new claim, then it must only be within the statute of limitations of the new claim. Therefore, however plaintiff's amended complaint is viewed in this case, her claim against RadioShack is within the applicable statute of limitations.

### 2. Laches

RadioShack also argues that plaintiff's claim against it is barred by the doctrine of laches. As stated by the Sixth Circuit:

> Laches is an equitable doctrine, the elements of which are short of an estoppel, and the time in which it may ripen is short of the applicable period of limitation, and it is invoked in equity to defeat a tardy litigant on account of whose inexcusable delay, after possession of knowledge of the facts, his adversary, who has materially changed his situation, may defeat a recovery or defense because of the other's passiveness, if during the delay, and in reliance on such nonaction, a change has occurred in the situation and condition of the adversary to such an extent that to uphold the action and to grant the relief would put it beyond the power of the adversary to restore himself to his former situation or the court to place him in status quo. [Wells v. U.S. Steel & Carnegie Pension Fund, Inc., 950 F.2d 1244, 1250 (6th Cir. 1991), quoting Klineline v. Head, 205 Ky. 644, 266 S.W. 370, 372 (Ky. 1924).]

Moreover, "[u]nlike statutes of limitations, 'laches is not ... a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced.'" Ford Motor Co. v. Catalanotte, 342 F.3d 543, 550 (6th Cir. 2003) quoting Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

RadioShack argues that, while plaintiff had sufficient actual knowledge of the asset purchase transaction between WRI and RadioShack to alert her to potential successor liability on the part of RadioShack no later than March 31, 2005, plaintiff sat on her hands for more than a year before serving her amended complaint on April 25, 2006. Plaintiff disputes the date she learned of the transaction between WRI and RadioShack, but this Court does not find that knowledge of the Asset Purchase Agreement is enough to impute knowledge of successor liability. An asset transfer is neither necessary nor sufficient for imposing successor liability under the FMLA, Cobb, 452 F.3d at 555-556, and there are many factors used in determining successor liability, as detailed above. Grace, 521 F.3d at 671-672. In this case, WRI at least nominally remained in business after the Asset Purchase Agreement and it took part in discovery. Moreover, in March 2005, WRI answered plaintiff's interrogatories and indicated that an insurance policy was in existence at the time of the alleged discrimination and that, under the terms of the policy, the insurer would be liable. (WRI's Answers to Plaintiff's First Interrogatories, attached as Exhibit M to Plaintiff's Motion for Partial Summary Judgment and as Exhibit B to Plaintiff's Response to RadioShack's Motion for Summary Judgment) According to plaintiff's motion for leave to amend her complaint, and uncontradicted by RadioShack, plaintiff was informed for the first time on January 30, 2006 that WRI was uninsured with respect to plaintiff's claim and that WRI had been dissolved. (D/E #50) Plaintiff's motion for leave to amend her complaint was filed on February 10, 2006, less than two

weeks after she learned of WRI's dissolution, false assertion regarding insurance coverage, and inability to provide relief. (D/E #50) Given that timing, this Court finds that plaintiff did not inexcusably delay in bringing a claim against RadioShack and, therefore, her claim is not barred by the equitable doctrine of laches.

## V. Conclusion

For the reasons discussed above, this Court recommends that plaintiff's motion for partial summary judgment be granted, RadioShack's renewed motion for summary judgment be denied, and RadioShack be deemed a successor in interest to WRI with respect to plaintiff's claim.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address

each issue contained within the objections specifically and in the same order raised.


s/Virginia M. Morgan_____
Virginia M. Morgan
United States Magistrate Judge


Dated:  August 26, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's
ECF System and/or U. S. Mail on August 26, 2008.

s/Jane Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan