UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RENEE FINNERTY,

                                        Plaintiff,

                                                        CIVIL CASE NO.  04-cv-40247

v.

WIRELESS RETAIL, INC.,                  HONORABLE STEPHEN J. MURPHY, III
RADIOSHACK CORP., KIOSK
OPERATIONS, INC., and
SC KIOSKS, INC.,

                                        Defendants
_____/

## ORDER REJECTING REPORT AND RECOMMENDATION AND
GRANTING DEFENDANT RADIOSHACK'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

    Now before the Court are the August 28, 2008 Report and Recommendation of

Magistrate Judge Virginia M. Morgan [docket entry #124], the objections filed by the

Defendant RadioShack Corporation [docket entry #126], the plaintiff's corresponding

response to the objections [docket entry #127], and the reply [docket entry #128].  The

parties also filed sur-replies without leave of the Court [docket entries #129, 130].  The

magistrate judge's Report and Recommendation recommended that, considering the

plaintiff's motion for partial summary judgment [docket entry #100] and the defendant

RadioShack's motion for summary judgment [docket entry #114], the defendant

RadioShack be considered a successor corporation to the original defendant Wireless

Retail, Incorporated, and that RadioShack's statute of limitations and laches defenses be

denied.  As a result, according to the magistrate judge, the plaintiff's motion for partial summary judgment should be granted and the defendant RadioShack's motion for summary judgment be denied.   This case was administratively reassigned from the Honorable Paul V. Gadola to the undersigned on September 4, 2008 [docket entry #125].

The Court held oral arguments on the objections to the Report and Recommendation on March 10, 2009.  After considering the Report and Recommendation and the objections, hearing from the parties, and conducting the requisite de novo review of the motions and briefs,  the Court will grant the defendant RadioShack's motion for summary judgment based upon the reasons stated below.

BACKGROUND

The magistrate judge aptly set forth the background of this case, in detail[1]:

_____

[1]The parties do not object to the facts as set forth by the magistrate judge and, therefore, the Court accepts and adopts them as the facts of record.  The Court has incorporated them here for ease of reference.  In setting forth the facts, the magistrate judge used the following citation nomenclature:

Dep I = Deposition of Plaintiff, March 23, 2005 (pp. 21-40, 49-108, 113-124 attached as Exhibit "Finnerty" to Plaintiff's Motion for Partial Summary Judgment; pp. 17-32, 41-44, 49-76, 81-108 attached as Exhibit A to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment; pp. 17-32, 49-52, 85-108 attached as Exhibit G to RadioShack's Renewed Motion for Summary Judgment)

Dep II = Deposition of Harry Hill, August 30, 2005 (pp. 1, 9, 11-20, 22-23, 28-31, 33 attached as Exhibit "Hill" to Plaintiff's Motion for Partial Summary Judgment

Dep III = Deposition of Jeffrey Bland, October 8, 2007 (pp. 1-67 attached as Exhibit "Bland" to Plaintiff's Motion for Partial Summary Judgment; pp. 38-41, 58-61 attached as Exhibit L to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment)

Wireless Retail, Inc. ("WRI") was a privately held national retail chain specializing in the sale of cellular phones and services. From its Arizona headquarters, WRI operated over 675 "stores," which typically consisted of "kiosks" operated inside shopping malls and other retailers including, Sam's Clubs, Wal-Marts, K-Marts, Best Buys, Home Bases and Sears. (WRI Employee Handbook, p. 2, attached as Exhibit 3 to D/E #35).

Plaintiff began working for WRI in 2000 and her job was to sell cell phones and other wireless services at kiosks in various stores, including Sam's Clubs. (Dep I, pp. 21, 26) Eventually plaintiff worked as a Field Manager managing five to six kiosk locations. (Employee Change Form, January 2, 2002, attached as Exhibit A to Plaintiff's Motion for Partial Summary Judgment; Dep I, pp. 36, 40, 51) According to plaintiff's deposition testimony, plaintiff learned she was pregnant in March 2002 and, while she told her direct supervisor she was pregnant and needed time off, she was intimidated into working an intense workload that included working longer hours than when she was not pregnant. (Dep I, pp. 50-51, 53, 58, 120-121) In July 2002, plaintiff requested and received a voluntary demotion to the position of Store Supervisor in order to reduce her work hours after she became pregnant. (Dep I, pp. 50, 60-62; Employee Change Form, attached as Exhibit B to Plaintiff's Motion for Partial Summary Judgment).

Plaintiff's deposition testimony also provides that, after the demotion, her new Field Manager insisted on maintaining a demanding schedule and, while plaintiff requested some relief due to her pregnancy, none of her superiors at WRI provided it. (Dep I, pp. 62-63, 67-68) In September 2002, plaintiff attempted to obtain information regarding WRI's maternity leave

_____

Dep IV = Deposition of Andrew Zeinfeld, October 15, 2007 (pp. 1-71 attached as Exhibit "Zeinfeld" to Plaintiff's Motion for Partial Summary Judgment; pp. 1, 14-25, 50-57, 62-69 attached as Exhibit K to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment; pp. 1, 18- 25, 50-57, 62-65 attached as Exhibit F to RadioShack's Renewed Motion for Summary Judgment)

Dep V = Deposition of Tammy Lee, March 10, 2005 (pp. 1, 6-9 attached as Exhibit "Lee" to Plaintiff's Motion for Partial Summary Judgment; pp. 1, 6-9, 38-41 attached as Exhibit G to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment; pp. 1, 6-9 attached as Exhibit H to RadioShack's Renewed Motion for Summary Judgment; pp. 1-9 attached as Exhibit F to Plaintiff's Response to RadioShack's Renewed Motion for Summary Judgment)

Dep VI = Deposition of Plaintiff, January 10, 2008 (pp. 178-181 attached as Exhibit G to RadioShack's Renewed Motion for Summary Judgment)

policy and she was told, while WRI had no maternity leave policy, plaintiff was eligible for FMLA leave. (Dep I, pp. 82-84; September 12, 2002 e-mail, attached as Exhibit C to Plaintiff's Motion for Partial Summary Judgment, Exhibit D to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment and Exhibit B to RadioShack's Renewed Motion for Summary Judgment).

Plaintiff was granted leave and it was to start on November 1, 2002. (Dep I, p. 91; Dep II, p. 30) Plaintiff was scheduled to work on October 25, 26 and 31, 2002. (Dep II, pp. 13-14, 22, 28-29) According to plaintiff's declaration, she had trouble standing or sitting without bladder incontinence during her October 25, 2002 shift. (Plaintiff's Declaration, August 30, 2005, attached as Exhibit F to Plaintiff's Motion for Partial Summary Judgment) According to plaintiff's deposition and the deposition of her Field Manager, plaintiff called her Field Manager prior to her shift on October 26, 2002 to request that she start her maternity leave early and he approved it. (Dep I, pp. 92-94; Dep II, pp. 13-14, 22) However, after plaintiff submitted her medical certification on November 4, 2002, she was contacted by her Field Manager and told that her employment had been terminated for three "no-call no shows." (Dep I, p. 101; Dep II, p. 17) On July 21, 2004, plaintiff filed suit against WRI in Wayne County Circuit Court, alleging violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA") and pregnancy discrimination in violation of the Elliot-Larsen Civil Rights Act, M.C.L. § 37.101 *et seq.* ("ELCRA"). (Complaint, attached as an Exhibit to D/E #1) On August 26, 2004, WRI removed the action to federal court. (Notice of Removal, D/E #1)

On October 1, 2004, WRI entered into an Asset Purchase Agreement with RadioShack.[2]  Pursuant to the Asset Purchase Agreement, WRI sold certain specified property and assets to RadioShack for $57 million, including the fixtures, information systems, training and distribution assets, and

---

[2]The Asset Purchase Agreement is attached as Exhibit L to Plaintiff's Motion for Partial Summary Judgment and as Exhibit J to RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment. It is also used, but not attached as Exhibit D to RadioShack's Renewed Motion for Summary Judgment. An excerpt from the Asset Purchase Agreement is attached as Exhibit A to Plaintiff's Response to RadioShack's Renewed Motion for Summary Judgment. RadioShack tabs different parts of the Asset Purchase Agreement in its Exhibit J. Plaintiff provides the tab numbers for parts of the agreement at the beginning of her Exhibit L, but her Exhibit is not actually tabbed. Therefore, for ease of reference, all cites by the Court to the Asset Purchase Agreement will be cites to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment.

inventory "used for the operation of retail kiosks that sell and activate cell phones pursuant to the Communication Center Kiosk License Agreement by and between [WRI] and Sam's West, Inc." (Asset Purchase Agreement, Section 1.1(a)(v); attached as Tab 1 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment) RadioShack also assumed WRI's lease interest in its Arizona office complex, though RadioShack did sublease part of that complex back to WRI and WRI continued to independently operate its non-Sam's Clubs kiosk business. (Assignment and Assumption of Lease, attached as Tab 8 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment; September 30, 2004 letter, attached as Tab 7 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment; Dep IV, pp. 21-23.) WRI also terminated its agreement with Sam's Clubs, and RadioShack negotiated its own de novo License Agreement with Sam's Clubs. (Release and Termination Agreement, attached as Tab 3 to Exhibit J of RadioShack's Response to Plaintiff's Partial Motion for Summary Judgment)

Under Section 6.4 of the Asset Purchase Agreement, WRI and RadioShack further agreed that, effective September 30, 2004, WRI would terminate the employment of employees identified in Schedule 3.7 to the Agreement and that RadioShack would offer employment to each of those specified individuals the next day subject to their passing a background check and RadioShack's normal hiring policies. (Asset Purchase Agreement, § 6.4, attached as Tab 1 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment) WRI employees who were not assigned to Sam's Club kiosks were not included in the transfer of eligible employees and none of them became RadioShack employees. (Dep III, pp. 60-61; Dep IV, pp. 67-68) Moreover, in an accompanying "Transition Agreement", WRI agreed it would retain a certain number of "Transitional Employees" for up to ninety-days at a prorated cost to both WRI and RadioShack for the purpose of assisting in the smooth transfer of the purchased assets. (Transition Agreement, ¶ 23, attached as Tab C to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment) Among WRI's executive management team, only Chief Operating Officer Paul Elliot became a RadioShack employee, but he only briefly worked at RadioShack and his position was very different from the position he held with WRI. (Dep IV, pp. 52-54, 62-64).

The Asset Purchase Agreement expressly excluded from the sale WRI's rights in its subsidiaries as well as WRI's articles of incorporation, minute books, corporate records, bank accounts or lock boxes, securities held, insurance policies, and any benefit plans relating to WRI's business. (Asset Purchase Agreement, § 1.1(b), attached at Tab 1 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment)

5

Moreover, under the heading "Excluded Liabilities," the Asset Purchase Agreement provided that the parties acknowledged and agreed that RadioShack was not assuming and was not be responsible for any liability relating to the any claims or obligations relating to any employee of WRI and not expressly assumed by RadioShack in the agreement, any liability of WRI to a shareholder of WRI or related person, any liability arising out of any proceeding pending as of the date of the agreement, and any liability arising out of or resulting from WRI's compliance or noncompliance with any legal requirements. (Asset Purchase Agreement, § 1.2(b), attached as Tab 1 to Exhibit J of RadioShack's Motion for Partial Summary Judgment) Schedule 3.4 of the Agreement specifically identifies 76 pending lawsuits or EEOC Charges against WRI, including plaintiff's, as among the excluded liabilities. (Asset Purchase Agreement, Schedule 3.4; attached as Tab 2 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment and as Exhibit A to Plaintiff's Response to RadioShack's Renewed Motion for Summary Judgment)

In Section 3.19 of the Asset Purchase Agreement, WRI verified that "based on a reputable third party's opinion and [WRI's] review, WRI believes that [RadioShack] is paying fair value, in an arms'-length transaction for the Purchased Assets" and that "immediately after giving effect to the consummation of the transactions contemplated by this Agreement, WRI will not have unreasonably small capital with which to conduct its present or proposed business." (Asset Purchase Agreement, § 3.19, attached as Tab 1 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment) That assurance was further verified by a letter from the third-party auditor, MCA Financial Group, Ltd., attached to the Asset Purchase Agreement (September 30 2004 letter, attached as Tab 6 to Exhibit J of RadioShack's Response to Plaintiff's Motion for Partial Summary Judgment)

Within months of the Asset Purchase Agreement, RadioShack replaced all of WRI's kiosks with new physical structures of its own design. (Dep IV, pp. 47-48) RadioShack also closed the office center in Arizona and laid off its employees as soon as it was able to consolidate the center's functions at RadioShack's own preexisting operations facility in Texas. (Dep III, pp. 39-40; Dep IV, p. 23)

In March 2005, WRI answered plaintiff's interrogatories and indicated that an insurance policy was in existence at the time of the alleged discrimination and that, under the terms of the policy, the insurer would be liable. (WRI's Answers to Plaintiff's First Interrogatories, attached as Exhibit M to Plaintiff's Motion for Partial Summary Judgment and as Exhibit B to Plaintiff's Response to RadioShack's Motion for Summary Judgment)

On July 28, 2005, WRI filed a motion for summary judgment on the

6

basis that there was no genuine issue of material fact and it was entitled to judgment as a matter of law. (D/E #35) On January 30, 2006, the Honorable Paul V. Gadola held a hearing on that motion and, subsequently, denied WRI's motion for summary judgment. (D/E #46)

According to plaintiff, at the January 30, 2006 hearing, counsel for WRI informed plaintiff that WRI was "out of business" and that he would be filing a motion to withdraw as counsel. On February 10, 2006, counsel for WRI filed a motion to withdraw as counsel, indicating that WRI no longer has the means of paying for counsel and has ceased to exist as an ongoing entity. Counsel also indicated that WRI has "no intention of defending or otherwise retaining representation with respect to any further proceedings in this action." (Motion to Withdraw as Defense Counsel, D/E #49) On February 14, 2006, Judge Gadola entered an order granting the motion to withdraw. (D/E #53)

On February 10, 2006, plaintiff filed a motion for leave to amend her complaint in order to add RadioShack as a successor corporation. (D/E #50) In that motion, plaintiff argued that she was informed for the first time on January 30, 2006 that WRI was uninsured with respect to plaintiff's claim and that WRI had been dissolved. Plaintiff requested amending the complaint because, upon information and belief, WRI had sold a portion of its business to RadioShack and the FMLA specifically allowed successor liability.

On March 24, 2006, Judge Gadola granted plaintiff's motion for leave to amend the complaint. (D/E #57) In granting that motion, Judge Gadola wrote:

> The Court, having reviewed Plaintiff's motion, accompanying brief, and the record, determines that, for reasons stated in the motion and its accompanying brief, the Court will grant the relief requested. *See* Fed. R. Civ. P. 15 (instructing that "leave shall be freely given when justice so requires") *and* 29 U.S.C. § 2611(a)(A)(ii)(II) (providing for liability of "any successor in interest of an employer.").

On September 14, 2006, RadioShack filed a motion for summary judgment. (D/E #72) In that motion, RadioShack argues that RadioShack is not a "successor in interest" to WRI for the purposes of Plaintiff's particular claims of intentional discrimination by WRI and that plaintiff's claims against RadioShack are barred by the applicable statutes of limitation.

On March 30, 2007, Judge Gadola denied RadioShack's motion for summary judgment because it was premature. (D/E #77) A discovery plan and scheduling order were subsequently issued. (D/E #79, #80). . . .

On November 2, 2007, plaintiff moved for partial summary judgment on the issue of successor liability. (D/E #100) In that motion, plaintiff argues that RadioShack is a successor in interest with respect to plaintiff's claims

because each factor of the multi-factor test for successor liability weighs in favor of imposing such liability in this case. Those factors include RadioShack's continuing of WRI's business operations with the same locations, work force, equipment, products and services, and the fact that RadioShack had notice of plaintiff's claims.

On January 18, 2008, RadioShack filed a response to plaintiff's motion for partial summary judgment. (D/E #113) In that response, RadioShack argues that, in this case of first impression, RadioShack is not WRI's successor for purposes of plaintiff's FMLA or ELCRA claim because the relevant factors weigh against imposing such liability and the over-arching balancing test compels a decision in favor of RadioShack. RadioShack specifically notes, among other factors, that it only purchased a portion of WRI's business and WRI continued with its remaining kiosk businesses, that the asset purchase agreement specifically excluded assumption of liability for plaintiff's claims, and that plaintiff's joint employer could have provided relief if sued by plaintiff.

On January 22, 2008, plaintiff filed a reply to RadioShack's response to plaintiff's motion for partial summary judgment. (D/E #115) In that reply, plaintiff argues that this case is not one of first impression, as argued by RadioShack. Plaintiff also argues that there is no evidence supporting RadioShack's assertions that the exclusion of plaintiff's claims was reflected in the purchase or that finding in favor of plaintiff would chill commerce. In the reply, plaintiff also reiterates why the factors for determining successor liability weigh in her favor, specifically noting that no evidence suggests imposing any liability on CNA. . . .

On January 18, 2008, RadioShack filed a renewed motion for summary judgment. (D/E #114) In that motion, RadioShack argues that plaintiff's claim is barred by the applicable statute of limitations and by the equitable doctrine of laches. RadioShack also argues that, as a matter of law, it is not a successor in interest for WRI with respect to plaintiff's claims. In making that last argument, RadioShack refers to and relies on its brief in response to plaintiff's motion for partial summary judgment.

On February 7, 2008, plaintiff filed a response to RadioShack's renewed motion for summary judgment. (D/E #117) In that response, plaintiff argues that her claims are not barred by the statute of limitations because the amended complaint relates back to the original, timely filed complaint. Plaintiff also argues that her claims are not barred by the doctrine of laches because neither WRI nor RadioShack informed plaintiff of the asset purchase agreement, despite the fact that plaintiff was involved in ongoing litigation with WRI, and she timely filed an amended complaint once she learned of the relevant facts. Plaintiff further argues that the factors used in determining successor liability compel a finding of successor liability in this case.

8

On February 15, 2008, RadioShack filed a reply in support of its motion for summary judgment. (D/E #118) In that reply, RadioShack argues that there is no need for a successor liability analysis where plaintiff could have brought a claim against CNA, her joint employer along with WRI. RadioShack also argues that the asset purchase agreement was well publicized. RadioShack further argues that the cases plaintiff cites to with respect to RadioShack's statute of limitations arguments are irrelevant given that those cases do not involve statutes of limitations.

Report and Recommendation, pp. 2-12 [docket entry #124].

<u>LEGAL STANDARD</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as to a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir. 1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient

10

to require submission of the issue to the jury. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; see *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

<u>ANALYSIS</u>

<u>I.  Statute of Limitations</u>

The Court will first address the statute of limitations issue.  The parties do not dispute that in the present case, the plaintiff's claims must be brought within three years following the last act that constituted the alleged violation.  *See* 29 U.S.C. § 2617(c) (for willful violations); M.C.L. § 600.5805(10)(allowing three years from the date of the injury). Additionally, there is no dispute that when considered from the date of the injury, the plaintiff's termination from employment on or about November 4, 2002, the three year statute of limitations had expired before the complaint was served on RadioShack on April 26, 2006. As a result, the amended complaint must relate back to the original complaint in order to satisfy the statute of limitations.

Federal Rule of Civil Procedure 15(c) generally governs the relation back of amendments:

(c) Relation Back of Amendments.
(1) When an Amendment Relates Back.
An amendment to a pleading relates back to the date of the original pleading when:
(A) the law that provides the applicable statute of limitations allows relation back;
(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading; or
(C) the amendment changes the party or the naming of the party against whom a

11

claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).

The magistrate judge recognized that the plaintiff's "amended complaint" was more properly characterized as a supplemental pleading, pursuant to Federal Rule of Civil Procedure 15(d). The Court agrees with the magistrate judge on this point. Moreover, both parties conceded at the oral argument that the distinction between an amended pleading and a supplemental pleading is not relevant to the analysis of whether the pleading may relate back pursuant to Rule 15(c). *See Bromley v. Michigan Educ. Ass'n*, 178 F.R.D. 148, 156 (E.D. Mich. 1998)(Cleland, J.).

Turning then to consider whether the supplemental pleading satisfies the requirements of rule 15(c), the plaintiff argues that it need only satisfy one of the three disjunctive prongs of the rule, *i.e.* 15(c)(1)(A), (B), or (C), in order for the pleading to relate back. She further argues that because there is no dispute that the events alleged in the supplemental pleading naming RadioShack as a successor to WRI arose out of the same events and transaction that gave rise to the original complaint, Rule 15(c)(1)(B) is satisfied, the complaint relates back to the original complaint, and the claims against RadioShack should be considered timely. Moreover, in additon to her argument regarding subsection 15(c)(1)(B), the plaintiff argues that she has satisfied subsection 15(c)(1)(A) because the

12

FMLA's definition of "employer" includes "successor in interest to an employer."  *See* 29 U.S.C. §§ 2611(4)(A)(ii)(II), 2617(a).

A.  Determination of which Subsection of the Rule Applies

Although the Court does not disagree that subsection 15(c)(1)(B) has been satisfied, the Court disagrees that the disjunctive construction of subsections 15(c)(1)(A)-(C) does not require the plaintiff to satisfy 15(c)(1)(C).  Federal Rule of Civil Procedure 15(c)(1)(C) clearly relates to situations in which one party is changing the party named in the claim.  Fed. R. Civ. P. 15(c)(1)(C)("when . . .(C) the amendment changes the party or the naming of the party against whom a claim is asserted" the amendment relates back if the requirements of 15(c)(1)(B) and 15(c)(1)(C)(i) and (ii) are met).  There can be no dispute that this rule directly addresses the situation at hand, a situation in which the plaintiff  now seeks relief from the previously unnamed RadioShack.  Furthermore, there can be no dispute that the other two subsections, Rule 15(c)(1)(A) and (B) only, at best, obliquely address the situation.  As a result, the Court is constrained to apply the more specific of the rules that may apply.  *See United States v. Perry*, 360 F.3d 519, 535 (6th Cir. 2004)("One of the most basic canons of statutory interpretation is that a more specific provision takes precedence over a more general one.") (citing *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989), and *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)).  *See also Szabo v. CSX Transportation, Inc.*, 1 Fed. Appx. 277, 279 (6th Cir. 2001)(unpublished)(In a case in which there was no dispute that the amended complaint arose out of same transaction or occurrence, the Court of Appeals for the Sixth Circuit

13

stated, "Because the amended complaint at issue in this matter purports to change the name of the party against whom the action is brought, the provisions of Rule 15[(c)(1)(C)] are implicated.").

Furthermore, the adoption of the plaintiff's argument that if she meets the requirements of 15(c)(1)(B), she need not also meet (c)(1)(C), would lead to an illogical result.   Subsection 15(c)(1)(C), in addition to its other requirements, requires the satisfaction of Rule 15(c)(1)(B).   Accordingly, the plaintiff's interpretation would render the additional requirements imposed under 15(c)(1)(C) meaningless, for if 15(c)(1)(B) were met that alone would be sufficient for relation back and there would be no reason to look to subsection (c)(1)(C)'s additional requirements.  Such a reading, a reading in which part of the rule is rendered superfluous to another part, cannot be a correct reading, especially in light of the other possible interpretation.   Therefore, the Court declines to adopt the plaintiff's reading of the rule and instead concludes that for the supplemental pleading to relate back to the original complaint, in the instant case, the plaintiff must demonstrate that the requirements of Federal Rule of Civil Procedure 15(c)(1)(C) are met.  The  Court now turns to an examination of whether plaintiff has satisfied those requirements.

### B.  Whether the Plaintiff has Satisfied Rule 15(c)(1)(B)

As set forth above, in order for an amended pleading to relate back pursuant to Federal Rule of Civil Procedure 15(c)(1)(C), Rule 15(c)(1)(B) must first be met.   In this case, there is no dispute that (B) has been met.  The plaintiff's claims set forth in the supplemental pleading arise directly out of the claims set forth in the original pleading.

14

Additionally, Rule 15(c)(1)(C) requires that, within the requirements of Fed. R. Civ. P. 4(m) (120 days of the filing of the original complaint), RadioShack must have: (i) received notice of the action against it such that it is not prejudiced in defending on the merits and, (ii) knew or should have known that the action should have been brought against it but for a mistake concerning its identity. Fed. R. Civ. P. 15(c)(1)(C)(i)-(ii). This second part can, at its essence, be considered to contain two separate parts, namely that RadioShack, knew or should have known that the action should have been brought against it and that there was a "mistake" concerning RadioShack's identity.

In the present case, the record amply demonstrates that RadioShack was aware that the plaintiff's claim against WRI existed at the time it executed the Asset Purchase Agreement ("Agreement") on October 1, 2004. The Asset Purchase Agreement expressly listed the plaintiff's discrimination suit against WRI. Furthermore, this acknowledgment of the suit was well within 120 days of the filing of the plaintiff's original complaint on July 21, 2004. But the mere fact that RadioShack was made aware of the existence of the suit does not satisfy the notice requirement of Rule 15(c). The nature of the notice provided to RadioShack through the agreement must also be taken into account when considering whether the requirements of Federal Rule of Civil Procedure 15(c) have been met.

In *Szabo v. CSX Transportation,* 1 Fed. Appx. 277 (6th Cir. Jan. 4, 2001), an unpublished case, an employee of 40 years sued the wrong employer, a predecessor of his then-employer. Szabo sought to amend the complaint after the statute of limitations had run by amending the complaint to add the proper party, Consolidated Rail Corporation

15

("Conrail"), and then serving Conrail's statutory agent for service of process.  CSX and

Conrail used the same agent for service and therefore, Szabo argued, there could be no

dispute that Conrail received notice of the complaint within the statutory time allotted when

the first complaint was served on its agent.

The Court of Appeals found that service of the complaint upon the common agent

of two companies does not suffice to demonstrate that the second company had notice

under the rule, stressing that it is not enough that a company merely know that a suit is

pending:

> In this case, the original complaint filed by Szabo never mentioned CSX or
> gave any indication that any railroad other than Conrail was a proper party
> defendant. . . . [T]herefore, there is no indication that the later-named
> defendant knew or should have known that it was the intended defendant at
> the time of the filing of the complaint.

*Szabo,* 1 Fed. Appx. at 279-80 (citing *Peterson v. Sealed Air Corp.,* 902 F.2d 1232,

1237 (7th Cir. 1990)("A firm could have notice (Rule[15(c)(1)(C)(i)]) without recognizing that

it was the right party (Rule [15(c)(1)(C)(ii)])").

Such is the case here.  RadioShack undisputedly was made aware that the suit by

the plaintiff was pending against WRI.   The record, however, also undisputedly

demonstrates that there was no manner in which RadioShack "knew or should have known"

that but for a mistake concerning the proper party, the action would have been brought

against it.  Fed. R. Civ. P. 15(c)(1)(C)(ii).   Indeed, the Agreement listed the suit as among

WRI's liabilities that were expressly excluded.[3]  RadioShack had obtained assurance of

---

[3]The Court recognizes that RadioShack cannot merely contract away successor
liability under the prevailing law.  The Court finds, however, that the Agreement terms

WRI's financial status that indicated that following the transaction WRI would have sufficient assets to remain in business, and it did for at least the next fifteen months following the purchase.   Moreover, during the fifteen months that followed the execution of the Agreement, consistent with the obligations set forth in that Agreement, WRI continued to vigorously defend the action against the plaintiff. WRI filed an answer to the complaint, participated in discovery, filed several motions including a motion for summary judgment, and even participated in a settlement facilitation conference.   The record is completely absent any evidence that RadioShack had any involvement or knowledge of WRI's litigation with the plaintiff during this time or that the RadioShack had any information that WRI would ultimately stop defending the action.   Therefore, even taking all the facts in the light most favorable to the plaintiff, there is no evidence to demonstrate that RadioShack either knew or should have know that it was the proper party in the plaintiff's suit until such time that it received notice of the plaintiff's supplemental pleading, a date well outside the time requirements of Federal Rule of Civil Procedure 15(c). As a result, the plaintiff fails to satisfy the requirements of Rule15(c)(1)(C) and her supplemental pleading cannot be said to relate back to her original complaint.

---

are relevant in determining the nature of the notice that RadioShack received regarding the suit.  *See e.g.*, *Heitz v. Salant Corp.*, No. 95 Civ. 3866(DC), 1997 WL 13241, at *6 (S.D.N.Y. Jan. 15, 1997)(holding that the putative defendant could not "be said to have known it should have been named as a defendant . . . [because the putative defendant] was not [the plaintiff's] employer at the time of the suit and had never been.  Moreover, [the putative defendant] believed that under the terms of the Sale Agreement . . .  it was purchasing the assets . . . free and clear of all claims.  Thus, plaintiff has failed to show that [the putative defendant] should have known that but for a mistake in identity, plaintiff would be suing it on a successor liability theory.")

Furthermore, the correction that the plaintiff seeks to effect by adding RadioShack to the complaint is not the type of "mistake" that is permitted to be corrected under Rule 15(c)(1)(C)(ii).  The plaintiff argued on brief that the amendment should be allowed to relate back because given the timing of RadioShack's purchase of assets, and her inability to learn of that sale, it would have been impossible to add RadioShack any sooner.  The plaintiff's argument, at its essence, is that she was not aware of RadioShack's identity until the statute of limitations had passed, therefore, the complaint naming RadioShack should be considered timely under the rule.

While the plaintiff's argument has some intuitive appeal, the Sixth Circuit's interpretation of the rule rejects the application of Rule 15(c) in such situations.  "In this court, a plaintiff's lack of knowledge pertaining to an intended defendant's identity does not constitute a 'mistake concerning the party's identity' within the meaning of Rule 15(c)." *Moore v. Tennessee*, 267 Fed. Appx. 450, 455 (6th Cir.  2008)(citing *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996)).  *See also, In re Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448, 1450 (6th Cir. 1991)("FRCP 15(c) allows the correction of misnomers, but not the addition or substitution of new parties after the statute of limitations has expired."); *Worthington v. Wilson*, 8 F.3d 1253, 1256 (7th Cir. 1993)(quoting *Wood v. Worachek*, 618 F.2d 1225, 1229 (7th Cir.1980)("Thus, amendment with relation back is generally permitted in order to correct a misnomer of a defendant where the proper defendant is already before the court and the effect is merely to correct the name under which he is sued. But a new defendant cannot normally be substituted or added by amendment after the statute of

18

limitations has run.")  As a result, the Court finds that  plaintiff's lack of knowledge of RadioShack's identity does not give rise to the type of "mistake" that is required for the application of Rule 15(c)(3)(C) within the Sixth Circuit.  Consequently, the plaintiff's argument for relation back fails on this ground as well.

Additionally, the Court rejects the magistrate judge's recommendation that the consummation of the Purchase Agreement could constitute the last act of the plaintiff's FMLA claim such that the claim against RadioShack is timely.  The magistrate's consideration of this issue fails to cite any case law in support of this proposition, and even though the recommendation was challenged by the defendant, the plaintiff has not supplied the Court with any support for this proposition nor has the Court found any in its own search of precedent.  Absent any legal justification, the Court declines to adopt such a rule. Moreover, adopting such a rule could logically lead to a result in which any time one business entity sells assets to another, no matter how long after an alleged FMLA violation, the employees' otherwise stale FMLA claims could then be resurrected as timely.  This cannot be a correct result and is another reason to reject this recommendation.

Finally, the Court is cognizant of the plaintiff's concern that if the Court finds that the statute of limitations bars the plaintiff's claims against RadioShack in the instant case, all plaintiffs will be barred from relief in those situations in which the employer has transferred assets after the statute of limitations has expired.  Plaintiff argues that such a result would unduly frustrate the goals of the FMLA.  Although the Court does not purport to be adopting such a broad rule outside the facts of this case, the Court agrees that applied in all

19

instances, such a result could be unjust in light of the stated remedial goals of the FMLA. Generally, however, statutes of limitations frustrate the purpose of the statutes to which they apply.  Statutes of limitations are intended to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Burnett v. New York Central R.R.*, 380 U.S. 424, 428 (1968).  In that way, a statute of limitations is the legislative determination of the time that a claim becomes so stale that it will no longer be just to proceed.  In this case, although the application of the statute of limitations may frustrate the remedial goals of the FMLA, those goals have already been balanced with the staleness concerns by the legislature through the enactment of the three-year statute of limitations incorporated within the statute.  Moreover, the precedent interpreting Rule 15(c) leads to the conclusion that the rule cannot be applied to allow the plaintiff's supplemental pleading to relate back.  This Court declines to adopt the plaintiff's rule in favor of policy goals that are contrary to those set forth by the legislative and rule making processes.

Accordingly, for all the foregoing reasons, the plaintiff has failed to satisfy the requirements of Federal Rule of Civil Procedure 15(c).  Absent the application of Rule 15(c), the claims set forth against RadioShack were brought outside of the applicable statute of limitations and will be dismissed as untimely.

II.  Successor Liability

Although the Court has concluded that the claims against RadioShack are time

20

barred by the statue of limitations, the Court will also address the issue of successor liability.

> There exists a,

> common understanding of successor liability as a corporate law concept, applied when a corporation reorganizes to ensure that creditors are not defrauded. Successor liability under the FMLA, however, derives from labor law, not corporate law. Labor cases, whose holdings were later applied to Title VII cases, apply an equitable, policy driven approach to successor liability that has very little connection to the concept of successor liability in corporate law.

*Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 551 (6th Cir. 2006)(internal citations omitted).

"[T]he labor law concept of successor liability requires courts to balance the equities of imposing a particular legal obligation in a particular situation, considering 1) the interests of the defendant-employer, 2) the interests of the plaintiff-employee, and 3) federal policy embodied in the relevant federal statutes." *Cobb*, 452 F.3d at 552.

Moreover, courts should consider the eight factors listed in 29 C.F.R. § 825.107 when resolving a successor liability issue:

> (1) Substantial continuity of the same business operations;
> (2) Use of the same plant;
> (3) Continuity of the work force;
> (4) Similarity of jobs and working conditions;
> (5) Similarity of supervisory personnel;
> (6) Similarity in machinery, equipment, and production methods;
> (7) Similarity of products or services; and
> (8) The ability of the predecessor to provide relief.

29 C.F.R. § 825.107(a). Where as here, the underlying issue involves a determination of a successor's liability for a predecessor's alleged violation, whether the successor business

21

entity has notice of the allegations "may be relevant."  *Id.*

These nine factors are to be considered in their totality, 29 C.F.R. § 825.107(b), but are still only part of the "overarching, three-part test," outlined above.  *Grace v. USCAR*, 521 F.3d 655, 672 (6th Cir. 2008).

"[T]here is, and can be, no single definition of 'successor' which is applicable in every legal context."  *EEOC v. MacMillan Bloedel Containers*, Inc., 503 F.2d 1086, 1091 (6th Cir. 1974).  "Successor liability questions must be answered on a case by case basis, and 'a new employer ... may be a successor for some purposes and not for others.'"  *Cobb*, 452 F.3d at 551 (quoting *MacMillan Bloedel Containers*, *Inc.*, 503 F.2d at 1091). Additionally, the Court notes that very few courts, especially outside of *Cobb*, have addressed successor liability in the context of the FMLA in a meaningful way.  *See Sullivan v. Dollar Tree Stores, Inc.*, No. CV-07-5020-EFS, 2008 WL 1730079, at *5, n.4 (W.D. Wash.  Apr. 10, 2008).

### A.  Successor Liability Factors under 29 C.F.R. § 825.107(a)

#### 1.  Notice

In the present case, the Court believes that notice is of particular relevance.  As described above, there is no dispute that through the Asset Purchase Agreement, RadioShack had some knowledge of the existence of the plaintiff's claim prior to the amendment of the complaint.  Although RadioShack technically had knowledge that the plaintiff was proceeding in a claim against WRI, the evidence can only support a finding that RadioShack was on notice that it would *not* be required to defend the claim. Several facts

lead to this conclusion.

First, RadioShack negotiated the agreement to purchase certain assets of WRI and that agreement specifically excluded the liability for any the plaintiff's claims. While it is true that exclusion of such liabilities by contract does not necessarily prevent successor liability from attaching, it does appear relevant when considering the nature of the notice RadioShack had that it would be potentially liable for claims asserted for WRI's actions performed more than two years before the Agreement.

Second, WRI continued to defend against the case after the Agreement was executed without any apparent assistance from RadioShack. This could only lead RadioShack to believe that WRI was performing under the terms of the Agreement, and had retained all liability for the plaintiff's claim. Again, this fails to provide RadioShack with any meaningful notice of the claim as it relates to RadioShack.

Third, the price negotiated at arms length for the assets, excluding the liability for plaintiff's claims, and including an indemnification clause, was determined to be "fair market value" by an independent third party audit. Additionally, RadioShack received assurances that following the transaction, WRI would not have insufficient funds to conduct its remaining business. After the transfer of assets, WRI remained in business as for more than a year as a wholly separate entity from RadioShack and, stated above, defended the suit in accordance with the terms of the Agreement.

Each of these facts can only lead to a conclusion that although RadioShack undisputedly knew of the existence of the plaintiff's suit against WRI, RadioShack's notice

was that WRI was a viable entity capable of accepting the liability it had contracted to keep. There is no indication that RadioShack had any notice of the claim as it now relates to RadioShack.  Absent any meaningful notice of the claim, the Court finds that this factor strongly supports a finding that successor liability is not appropriate.

### 2.  Continuity of Business Operations

This Court, as did Magistrate Judge Morgan, acknowledges that the record undisputedly supports a conclusion that RadioShack employed a majority of WRI's former employees, operated all the Sam's Club kiosk operations, purchased WRI's fixtures, information systems, training assets, distribution center and assets, customer lists and inventory related to the Sam's Club kiosks, and assumed the Scottsdale, Arizona office complex lease interests of WRI.  Although RadioShack argues that this factor cannot tip in favor of successor liability because WRI remained in business, RadioShack has not produced any legal support for that conclusion.  The Sixth Circuit has explicitly held that a merger is not a precondition to finding liability for a successor corporation under the FMLA. *Cobb, 452 F.3d at 550.*  Therefore, although RadioShack did quickly replace all the kiosks with its own physical structures and closed the Arizona office complex, given the types and the extent of assets transferred from WRI to RadioShack under the Agreement, the Court concludes that RadioShack substantially continued WRI's business operations.  As a result, this factor favors the imposition of successor liability.

### 3.  Use of the Same Plant.

The relevance of this factor is not readily apparent.   In the instant case, because

24

neither WRI nor RadioShack's operated a plant producing the goods that were the subject of the Agreement, the factor appears to be of limited use. *See Cobain v. Destination Hotels & Resorts*, No. CIV-S-05-2248 FCD-DAD, 2007 WL 1589533, at *18 (E.D. Cal. June 1, 2007)(finding the "similarity in machinery, equipment, and production methods "irrelevant in a nonmanufacturing context" and declining to consider the factors).  Furthermore, to the extent that the factor could generally refer to the companies' use of the same physical space and production methods to accomplish the business goals of the respective companies, RadioShack's temporary operation of the Sam's Club kiosks (before replacing the physical structures with their own) and RadioShack's temporary occupancy of the Scottsdale, Arizona office complex have already been considered with respect to the continuity of business operations factor.  Although the plaintiff argues that consideration of the facts for one factor does not preclude consideration of the facts for another factor, the Court finds such a duplicitous discussion inefficient.  The analysis is an equitable one; the Court is not engaged in a mathematical tally of the number of factors in support for or against successor liability.  Therefore, to the extent that the RadioShack's temporary use of the Sam's Club kiosks and the Scottsdale, Arizona office complex could even be considered under this factor, those facts have already been taken into account in the successor liability analysis.

### 4.  Continuity of Workforce

Although the evidence for this factor is incomplete as to the exact number of

employees that transferred, there is agreement that a substantial majority of the WRI employees who worked at Sam's Clubs kiosks were employed by RadioShack. While the plaintiff did work at Sam's Clubs kiosks, there is no dispute that the plaintiff worked at Sam's Clubs kiosks in addition WRI's other locations. The evidence is unclear as to how often the plaintiff worked at the other non-Sam's Clubs kiosks.

Although RadioShack may be correct in asserting that because only Sam's Club kiosk employees were transferred to RadioShack, if the plaintiff were considered a non-Sam's Club kiosk employee she would not have even been eligible to become a RadioShack employee, that is not the focus of this factor. The factor plainly contemplates whether there was a continuity of the workforce as a whole, not whether the plaintiff's particular position was transferred. Consequently, this factor appears to weigh in favor of the imposition of successor liability but again, this has already been considered in the continuity of business operations factor above.

### 5. Continuity of Supervisory Personnel

In the present case, the record as reviewed by the magistrate judge demonstrates that no officer of WRI became an officer of RadioShack and only and only one member of WRI's executive management team became a RadioShack employee, albeit for a very brief period. Dep IV, pp. 52-54, 62-54. The record also demonstrates that WRI's supervisory sales personnel did transfer. Dep. III, p. 47. There is no evidence that anyone involved in the alleged discriminatory act against the plaintiff assumed a position with RadioShack. As a result of all of the foregoing facts, the continuity of the supervisory personnel with

26

respect to the imposition of successor liability is equivocal and favors neither position.

<u>6.   Continuity of Working Conditions; Machinery, Equipment and Methods of Production; Products and Services</u>**.**

Consideration of these factors probes the similarity of working conditions, the similarity of the manner of production of goods, and the similarity of the goods or services produced.  In the present case, the factors surrounding the production of goods are not imminently relevant because WRI and RadioShack did not produce goods in the traditional sense of a manufacturing setting.  *See Cobain*, 2007 WL 1589533, at *18.  Therefore, the application of these factors is of limited use.  However, to the extent that they can be applied to a nonmanufacturing setting where there are corollaries, as considered above, the evidence demonstrates that RadioShack purchased the rights to use the kiosks, the property associated with the kiosks, the inventory and software utilized by WRI in selling products at the Sam's Club kiosks.  Additionally, RadioShack continued to sell the same products sold by WRI from the kiosks.  There is no evidence regarding how the methods of production or the continuity of working conditions applies in the instant case.  To the extent that any of these factors apply to the instant analysis, the Court finds that they have been accounted for in the Court's discussion of the continuity of business operations discussion above.

<u>7. Ability of Predecessor to Provide Relief.</u>

Assessing this factor, the magistrate judge recognized that "The primary concern [of successor liability] . . . is to provide the discriminatee with full relief.  Such relief may be

27

awarded against the successor.  On the other hand, the amenability of the predecessor to suit and its ability to provided relief will be a necessary inquiry."  *MacMillan Bloedel Containers, Inc.*, 503 F.2d at 1092.

The facts as to this factor are dimly illuminated.  RadioShack argues that the facts demonstrate that it paid WRI $57 million for the asset purchase, the independent auditor concluded that WRI had sufficient assets to continue operations, and that WRI remained in business for approximately 15 months before the plaintiff attempted to bring RadioShack into this case. As a result, according to RadioShack, WRI had the ability to provide relief.

The plaintiff argues, however, that she was informed only as of January 30, 2006, by WRI's withdrawing defense counsel that WRI had debts greater than its assets and that WRI would no longer defend the case. Therefore, according to the plaintiff, WRI is presently unable to provide relief.  RadioShack does not dispute the existence of an email from WRI's then-counsel, Mark Cooper, indicating that he was informed by WRI that it would no longer be defending the case.  The email also indicated that WRI had in excess of $20 million in debts and no assets and that, even had a purported WRI insurance policy covered the plaintiff's claim, WRI was unable to meet the $150,000 deductible.

RadioShack, on the other hand, argues that the plaintiff has not demonstrated that all the avenues of relief of the possible predecessors have been exhausted or even examined. In support of this argument, RadioShack has provided a signed contract indicating that the plaintiff was an October 22, 2000 "Co-Employee Notice and Agreement" acknowledging that she was a co-employee of WRI and CNA Unisource, Inc., ("CNA"), and

that she would immediately contact CNA if she was subject to any type of discrimination. Def.'s Resp., Ex. B [docket entry #113-3].    Additionally supporting the co-employer argument, the plaintiff's WRI termination notice is titled, "Wireless Retail CNA Unisource Notice of Employee Separation." Def.'s Resp., Ex. C [docket entry #113-4].    The plaintiff refutes that CNA was a co-employer at the time of the discrimination through her own declaration that CNA only printed her checks for a period of time, ending sometime in 2001 or early to mid- 2002.  Pl.'s Reply to Mot. Summ. Judg., Ex. Z [docket entry #116].

Moreover, according to Radioshack, the plaintiff has not made any attempt to verify that WRI, its management, its possible alter egos, or its co-employers are actually unable to satisfy a prospective judgment.  RadioShack argues that there has been no record of WRI filing for bankruptcy and that the plaintiff has failed to make any showing that WRI or its officers cannot now provide relief.  At the hearing on this matter, the plaintiff countered that she has not pursued a further investigation of WRI's assets or any other avenue of relief because she could not do so without a default judgment against WRI, a judgment denied without prejudice by this Court when she sought to add RadioShack as a successor. The Court is entirely unclear as to why the plaintiff could not investigate WRI's status without a default judgment.[4]    In any event, the plaintiff argued at the hearing that it is

---

[4]Although the plaintiff's motion for a default judgment was denied without prejudice, the Court notes that on February 14, 2006, and March 6, 2006, respectively, the Court granted the plaintiff's motions for a temporary restraining order and preliminary injunction against WRI.  *See* docket entries #52, 55.  The preliminary injunction ordered:

   Defendant is restrained and enjoined from liquidating assets, including but not limited to accepting payment for the sale of its business, inventory, equipment, real property, leasehold interests, good will, customer lists or

presently unable to locate any of WRI's personnel and, even if it were able to do so, it would be stand in line behind many other creditors.  There is no factual support offered for the proposition that WRI presently has other creditors or that the plaintiff would stand inferior to the other creditors.

The Court begins its analysis of this issue by noting that there is an open question as to the relevant time period that should be examined when considering whether the predecessor is able to provide relief, at the time of the sale of assets or at the time of the successor motion.    See EEOC v. Nichols Gas & Oil, Inc., 518 F. Supp. 2d 505, 514 (S.D.N.Y. 2007).

Considering the earlier of the two possible time frames –  the time of the asset purchase, see id., neither party has submitted any financial statements or similar documents attesting to the financial status of WRI at the time of the Agreement.  As part of the sale, however, WRI confirmed that based upon its own review and that of a "reputable third party," it would "not have unreasonably small capital to with which to conduct it s present or proposed business."  Def.'s Resp., Ex. J, Tab 2, Agreement, § 3.19

─────────────────

goods, without reserving sufficient funds to meet its obligations in this matter in the event of a verdict favorable to Plaintiff, including Plaintiff's damages, double the amount of Plaintiff's damages (as provided under the Family and Medical Leave Act), attorneys' fees and costs.
Order for Prelim. Inj., Mar. 6, 2006 [docket entry #55].  The Court fails to comprehend why the plaintiff now claims that without a default judgment she could not investigate what happened to WRI after WRI "walked away with millions."  Pl.'s Mot. Summ. Judg., p. 1.  If the facts are as plaintiff purports them to be, and WRI indeed "walked away with millions," WRI would appear to be in violation of the Court's March 6, 2006 order requiring them to reserve funds to satisfy its obligations in this matter before liquidating any assets.  Despite this, the plaintiff has never moved for a finding of contempt.

[docket entry #113-12].  Moreover, WRI remained in business for fifteen months following the Agreement and continued to defend the case, including participating in a settlement facilitation conference.  Absent any evidence to the contrary, all of this leads to a conclusion that WRI had at least some ability to provide relief to the plaintiff from the time of the transfer of assets until some point prior to the plaintiff's motion seeking successor liability.

Examining WRI's  ability to provide relief at the latter time frame, the time of the successor liability motion, is more difficult.  As noted above, there is no dispute regarding the existence of Cooper's email, but the Court recognizes that the information in the email supplied by Cooper amounts to little more than bare allegations, statements that are extensively qualified and relate only second-hand knowledge: "I am not overly familiar with the corporate structure of Wireless Retail, Inc., so I am only able to give you limited information . . . Generally, it was explained to me . . . I was further told that . . . There was apparently . . ."  Pl.'s Mot. Summ. Judg., Ex. W [docket entry #100].  The plaintiff failed to support these bare allegations with any support and failed to provide a more substantive affidavit from Mr. Cooper regarding his own actual knowledge.  Taken as they are, even in the light most favorable to the plaintiff, the statements themselves are insufficient to establish that WRI is unable to provide relief.

Furthermore, the plaintiff has failed to present any other evidence that WRI is unable to provide relief.  No bankruptcy petition has ever been filed on behalf of WRI and, despite the assertion that WRI "walked away with millions" of dollars following the asset

31

purchase transaction, Pl.'s Mot. Summ. Judg., p. 1, the plaintiff admittedly failed to conduct any search for those assets. *See also*, Pl.'s Resp. to Def.'s Objs., p. 16, n.14 ("Essentially, WRI sold itself to RadioShack, took the proceeds, and walked away. . ."). The Court is baffled by her apparently contradictory stances, asserting that WRI "walked away with millions," and that WRI cannot now provide relief. The Court is also baffled by her inability to present any evidence regarding WRI's present inability to provide relief, considering that a preliminary injunction was issued and acknowledging that she is seeking relief from WRI's alleged successor, fully aware that the ability of the predecessor is an essential factor to be considered when weighing successor liability. *See Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985)("[I]t would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief. . .").

Moreover, the plaintiff's attempt to rebut RadioShack's assertion that CNA Unisource was another possible source of relief given that documentation exists stating that the plaintiff was a co-employee of CNA, is unsupported. Acknowledging that CNA's logo was no longer printed on the plaintiff's paychecks, there is no documentation representing the termination of the co-employment agreement. Therefore, although there exists scant evidence that WRI, its possible alter egos, or any co-employer actually have the present ability to provide relief, the evidence available also fails to demonstrate that WRI or any other potentially liable entity is actually unable to provide relief. As a result, the Court finds that this factor, the ability of the predecessor to provide relief, favors neither party's position

on the successorship analysis.

                B.  Balancing of the Equities

        Taken as a whole the factors are divided as to the imposition of successor liability and do not clearly favor either position.  Several factors are for the most part inapplicable to the present setting due to the nonmanufacturing nature of the business at issue.  *See Cobain*, 2007 WL 1589533, at *18.  The relevance of each factor, however, must be considered and weighed in light of the legal obligation at issue.  *Cobb*, 452 F.3d at 554.  In the present case, given the legal obligation at issue, the notice factor and the continuity of business operations appear to be the two most relevant factors.  The continuity of business operations succinctly captures the consideration that RadioShack substantially assumed some portion of WRI's business operations when it purchased the Sam's Clubs kiosk operations and operated that portion of the business in a substantially similar manner as WRI had operated it.  The notice factor, however, undoubtedly tips strongly in the opposite direction.  The nature of the notice provided to RadioShack, however, strongly disfavors successorship liability.  In particular, the facts demonstrate that not only did RadioShack fail to have any meaningful notice that it could be held liable for plaintiff's claim, they were under the informed understanding that they were not liable for her existing suit.  The ability to provide relief, an important factor itself, remains largely neutral in the present case based upon the lack of information.  The remainder of the factors, in this Court's opinion, are inapplicable to the present setting or have been incorporated within the continuity of business operations factor.  Even after considering each of these factors, the

Court is mindful that these factors are only one consideration that must be incorporated into the tripartite test.

The overall test for imposing a particular legal obligation on a potential successor is a balancing of the equities when considering: "(1) the interests of the plaintiff-employee, (2) the interests of the defendant-employer, and (3) the federal policy goals of the statute." *Grace v. USCAR*, 521 F.3d 655, 672 (6th Cir. 2008).

The FMLA, as a remedial statute, "should be construed broadly to extend coverage." *Cobb*, 452 F.3d at 559. The United States Court of Appeals for the Sixth Circuit has found that "the FMLA's focus on the individual employee appears to warrant emphasis on [the employee's interest] prong of the equity analysis. . ." *Grace*, 521 F.3d at 675.

The Court begins its consideration with the federal policy underlying the FMLA because it is the most clearly illuminated.

### 1.  Federal Policy Underlying the FMLA

The FMLA was intended to apply to all regular full-time employees that have been employed for 12 months and have worked at least 1250 hours during those twelve months. 29 U.S.C. § 2611(2)(A). *See, e.g.*, *Cobb*, 452 F.3d at 557. The parties have not disputed that at the time of her termination, the plaintiff met the requirements with WRI for eligibility under the FMLA.

The stated objectives of the FMLA are at least three-fold: 1) "balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;" 2) "entitle

34

employees to take reasonable leave for medical reasons, for the birth or adoption of a child;" and 3) accomplish the aforementioned objectives "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b). *See also* 29 C.F.R. § 825.101 ("The FMLA was predicated on two fundamental concerns – the needs of the American workforce, and the development of high-performance organizations."). The application of the first two objectives described clearly favor the plaintiff and the imposition of successor liability in that she sought to take leave from her employment with WRI to attend to her pregnancy-related medical needs. The application of the third prong, however, strongly favors not imposing successor liability in that RadioShack clearly has a legitimate interest in not compensating the employee of a predecessor corporation, one that had expressly agreed to retain the liability and one that remained in business and defended the suit for fifteen months following the transfer of assets. Indeed, the plaintiff was terminated nearly two years before RadioShack purchased the assets from WRI and there is considerable doubt whether, had plaintiff remained employed by WRI, she would have even been eligible for employment with RadioShack.

## 2. Interests of the plaintiff-employee

Although the plaintiff only briefly mentions her interests, there can be little doubt that the plaintiff has an interest in working free from pregnancy discrimination and in taking reasonably necessary medical leave related to that pregnancy. *See* 29 U.S.C. § 2601(b). WRI's alleged interference with the plaintiff's leave and her subsequent employment termination clearly contradict the FMLA's stated objectives. The plaintiff also has an

35

interest in receiving compensation from WRI or, in the alternative RadioShack, in that she had no control over the sale of assets by WRI to RadioShack nor had any control in WRI's alleged demise.  *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549 (1964)(The national labor policy requires "the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.")  Her interests, are however, tempered by the interests of RadioShack to the extent that they represent the "legitimate interests of employers."   29 U.S.C. § 2601(b).

### 3. Interests of the defendant-employer

Considering the interests of the defendant and potential successor-employer RadioShack, the magistrate judge noted that its interests support a finding that it is not a successor in interest for purposes of FMLA successor liability.  RadioShack purchased assets related to WRI's Sam's Clubs kiosks and retained a substantial number of sales employees to staff those kiosks.  There is no dispute that the Agreement expressly stated that WRI would retain liability for the plaintiff's suit.   Based upon the terms of the Agreement, including the listed assets included and liabilities excluded, a third-party audit determined that the sales price represented "fair market value."  *See Cobb*, 452 F.3d at 553 (citing  *Golden State Bottling Co., Inc.,  v. N.L.R.B.*, 414 U.S. 168, 185 (1973), for the proposition that liability can be reflected in the business' purchase price).  The terms of the Agreement clearly demonstrate the parties' intent and, absent other compelling justification, it would be grossly unfair to override that intent.   Although the FMLA may, in some

36

instances, provide that justification, in the view of the Court in this case, it does not for the limited purpose of holding RadioShack liable for WRI's alleged discrimination. Uncontradicted evidence supports a finding that RadioShack paid a fair price for the assets it purchased under the Agreement and the Agreement expressly excluded assuming any liabilities arising out of the plaintiff's suit. Moreover, RadioShack sought assurances that WRI would remain viable after the sale, WRI provided those assurances, and WRI remained in business for more than a year following the asset purchase. Moreover, consistent with the Agreement and the intent of the parties, WRI continued to defend the suit for fifteen months following the sale, vigorously defending motions and participating in a facilitation conference.

Additionally, to the extent that the plaintiff argues that "ability of the predecessor" to provide relief factor favors the imposition of the successor liability, the facts as she presents them tip in the opposite direction when considering the interests of RadioShack in the balancing of equities. The plaintiff argues that WRI's assets and personnel cannot now be located such that it cannot provide relief to the plaintiff. Taking that argument as true, it is unclear as to how RadioShack would defend a case upon the merits in a situation in which it has no ability to locate the records or personnel relevant to WRI's termination of the plaintiff. Indeed, RadioShack attested to the Court that attempts to locate the requisite WRI personnel have been unsuccessful. It would be entirely inconsistent with the principles of equity to require RadioShack, a corporation that took significant efforts to protect itself in this transaction, to now defend the case on the merits without the benefit of such evidence.

Finally, there is no indication that RadioShack has benefitted from any unfair labor practice allegedly committed by WRI. *See MacMillan*, 503 F.2d at 1092. RadioShack did not employ any of the decision makers involved in the alleged discrimination against plaintiff nor is there any evidence that the termination had a continuing deterrent effect upon the employees of either company. *See Golden State Bottling Co.*, Inc., 414 U.S.at 184. Furthermore, the Court cannot envision how the failure to impose successor liability in this instance under the particular facts of this case could "encourage evasion [of liability for discrimination] in the guise of corporate transfers of ownership." *See MacMillan*, 503 F.2d at 1092.

Therefore, after conducting the relevant inquiry into the factors enumerated under 29 C.F.R. § 825.107(a) , and carefully considering the equities at stake, the Court finds that the imposition of successor liability upon RadioShack is wholly inappropriate. Imposing liability under the circumstances would fail to "strike a reasonable balance between the interest in fully sanctioning unlawful conduct and the interest in facilitating the market in corporate and other productive assets." *Vucitech*, 842 F.2d at 946. Accordingly, the claims against the putative defendant RadioShack should be dismissed on this ground, as well as the statute of limitations discussed above.

### III.  Defendant RadioShack's Defense of Laches

RadioShack also argues that the plaintiff's claim is barred by the doctrine of laches because although she learned of the sale of WRI's assets to RadioShack as of at least

38

March 31, 2005, the plaintiff did not file the amended complaint until April 11, 2006.  As a result of this unjustified delay, according to RadioShack, it was unfairly prejudiced.  The plaintiff argues that she could not have learned of the transfer of assets, and thus the possible successor liability issue, any earlier than January 30, 2006, when she was informed by WRI's withdrawing counsel, because she had no way of knowing about the transaction.

 As recognized by the magistrate judge:

> Laches is an equitable doctrine, the elements of which are short of an estoppel, and the time in which it may ripen is short of the applicable period of limitation, and it is invoked in equity to defeat a tardy litigant on account of whose inexcusable delay, after possession of knowledge of the facts, his adversary, who has materially changed his situation, may defeat a recovery or defense because of the other's passiveness, if during the delay, and in reliance on such nonaction, a change has occurred in the situation and condition of the adversary to such an extent that to uphold the action and to grant the relief would put it beyond the power of the adversary to restore himself to his former situation or the court to place him in status quo.

*Wells v. U.S. Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1250 (6th Cir. 1991)(quoting *Klineline v. Head*, 205 Ky. 644, 266 S.W. 370, 372 (Ky. 1924)).  More succinctly stated, laches consists of two elements: "(1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party."  *Brown-Graves Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000).  The burden of establishing this affirmative defense is on the party raising the defense.  *EEOC v . Watkins Motor Lines, Inc.*, 463 F.3d 436, 439 (6th Cir. 2006).  "[A] laches defense is within the sound discretion of the trial court," and not the province of the jury. *Brzozowski v. Correctional Physician Services, Inc.*, 360 F.3d 173, 182 (3d Cir. 2004).

Considering this issue, the plaintiff asserts that there was no unreasonable delay because she sought to add RadioShack as a successor to WRI as soon as practicable given that she had no way of knowing about the sale of assets.  She also argues that the sale of assets to RadioShack was  hidden in that RadioShack was continuously referred to as SC Kiosks, which without more information, she could not have determined was a wholly owned subsidiary of RadioShack.

The plaintiff's alleged lack of knowledge of the transfer of assets, however, is flatly contradicted by the evidence on the record. The plaintiff's argument that the transaction failed to receive any press coverage that could have alerted her to the transaction is erroneous.  The WRI/RadioShack transaction was noted in the New York Times, on Oct. 5, 2004, just days after the transaction took place, and more than fifteen months before the plaintiff claims that she could have had any knowledge of the sale.  *See* "Company News; RadioShack Will Offer Cellphones in Sam's Club Stores", N.Y. Times, Oct. 5, 2004, at C3, *available at* 2004 WLNR 5398429.

More directly evidencing the plaintiff's knowledge, during the deposition of Deena Marano on March 31, 2005,  the plaintiff's attorney engaged in the following exchange with

WRI's Human Resources Manager:

> Q: Okay.  Have you had any changes **since the sale of Wireless Retail to Radio Shack**?
> A: In what respect?
> Q: Any changes in your responsibilities or the systems or anything like that?
> A: My responsibilities are a little bit changed because **once the sale occurred** then, of course, Tammy Lee is no longer with the company, **she went with that sale**, so Employee Relations now rolls up under myself.
> Q: Okay.  But that has only been recently?
> A: Yes, **since the sale of the company**.

Def.'s Mot. Summ. Judg., Ex. C, p. 14 (emphasis added) [docket entry #114-5].  The exchange clearly indicates that the plaintiff knew of the sale because it was plaintiff's attorney that asked the question regarding the sale of WRI to RadioShack.  Moreover, although the plaintiff argues that not only did she not have knowledge of the sale, but she did not have knowledge of the sale, Ms. Marano's response put her on notice that there were employees that transferred as part of the sale.  Additionally, there is no mention of SC Kiosks or any other obscuring reference in any of the questioning presented, the questioning plainly reveals that RadioShack was involved in a sale with WRI.

The plaintiff's assertion that she had no knowledge of the sale such that she could assert a claim of successor liability until January 30, 2006, is unfounded based upon the facts presented to the Court.  Instead, the facts indicate that the plaintiff had knowledge RadioShack's involvement in WRI's sale at least as of March 31, 2005.  Significantly, this was at a time when WRI was still defending the case, was nine months before Cooper would indicate that he had been told that WRI was then insolvent, and was more than a year before RadioShack was served with the amended complaint.

41

Accordingly, based upon the facts, the Court finds that there was an unreasonable delay in the assertion of the claim of successor liability against Defendant RadioShack.

Turning to examine the prejudice, the Court need only take the plaintiff's claims regarding the present inability of WRI to provide relief to the plaintiff and the inability to locate the WRI personnel as true to substantiate the prejudice to RadioShack.  Taken as true, these facts clearly supports a finding of prejudice to RadioShack in that, were the case to go forward, it is difficult to imagine how RadioShack would defend the case on the merits without the ability to located WRI's personnel or personnel records.  In addition, as part of the Agreement, RadioShack secured an indemnification clause, protecting its interests in the event that it was found liable for any excluded liabilities within the Agreement.  Again, assuming that as according to the plaintiff WRI is now unable to provide any relief, by waiting unreasonably delaying until only after WRI allegedly became insolvent and had disappeared, the plaintiff prejudiced RadioShack's ability to defend the case against the plaintiff on the merits or to assert the indemnity clause against WRI.  As a result, there can be little doubt that RadioShack has suffered prejudice as a result of the plaintiff's unreasonable delay.  The defendant RadioShack is therefore entitled to a defense of laches based upon the facts presented to the Court.

    V.  Conclusion

For all the foregoing reasons, the Court finds that the supplemental pleading as it related to the defendant RadioShack is barred by the statute of limitation, that successor liability should not be imposed against RadioShack, and that the equitable doctrine of

laches bars the plaintiff's claims.  As a result, summary judgement in favor of the defendant RadioShack and against the plaintiff is appropriate.

**ACCORDINGLY, IT IS HEREBY ORDERED** that the plaintiff's motion for partial summary judgment [docket entry #100] is denied.

**IT IS FURTHER ORDERED** that the defendant RadioShack's motion for summary judgment [docket entry #114] is granted.

**IT IS FURTHER ORDERED** that the Report and Recommendation regarding these motions [docket entry #124] is rejected.

**SO ORDERED.**


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated:  March 30, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 30, 2009, by electronic and/or ordinary mail.

s/Alissa Greer
Case Manager